# EXHIBIT C

# Master Netting, Setoff, Security and Collateral Agreement



**EDISON ELECTRIC INSTITUTE**

Version 1.1
October 25, 2002
©COPYRIGHT 2002 by the Edison Electric Institute

ALL RIGHTS RESERVED UNDER U.S. AND FOREIGN LAW, TREATIES AND CONVENTIONS AUTOMATIC LICENSE –
PERMISSION OF THE COPYRIGHT OWNERS IS GRANTED FOR REPRODUCTION BY DOWNLOADING FROM A
COMPUTER AND PRINTING ELECTRONIC COPIES OF THE WORK. NO AUTHORIZED COPY MAY BE SOLD. THE
INDUSTRY IS ENCOURAGED TO USE THIS MASTER NETTING, SETOFF, SECURITY AND COLLATERAL AGREEMENT
IN ITS TRANSACTIONS. ATTRIBUTION TO THE COPYRIGHT OWNERS IS REQUESTED.

## DISCLAIMER

The Edison Electric Institute ("EEI"), any member company of EEI, any member of the Drafting Committee individually or as representative of their respective company, makes no representations or warranties, express or implied, concerning this Agreement with respect to the accuracy, completeness or usefulness of the information, advice or recommendations contained therein and assumes no responsibility or liability with respect to the use of, or for damages resulting from the use of, information, advice, or recommendations contained in the Agreement.

All users are urged to consult their own legal counsel in connection with the preparation, negotiation and/or use of this Agreement or any provisions included herein.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

# TABLE OF CONTENTS

1.  COVER SHEET - MASTER NETTING, SETOFF, SECURITY, AND
    COLLATERAL AGREEMENT…..…………………………………………...1

2.  MASTER NETTING, SETOFF, SECURITY AND COLLATERAL
    AGREEMENT………………………………………………………………17

3.  CREDIT ELECTIONS COVER SHEET - COLLATERAL ANNEX TO THE
    MASTER NETTING, SETOFF, SECURITY AND COLLATERAL
    AGREEMENT…………………………………………………………………45

4.  COLLATERAL ANNEX TO THE MASTER NETTING, SETOFF
    SECURITY, AND COLLATERAL AGREEMENT………………..…….…55

5.  EXHIBIT A  TO COLLATERAL ANNEX - IRREVOCABLE STANDBY
    LETTER OF CREDIT FORMAT…………………………………………..….71

# MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT

## COVER SHEET

This *Master Netting, Setoff, Security, and Collateral Agreement* ("*Master Agreement*") is made as of the following date: April 25, 2008 ("Effective Date"). The *Master Agreement*, together with, and as amended by, this Cover Sheet, the Collateral Annex, the Credit Elections Cover Sheet, and any exhibits, schedules and supplements hereto or thereto shall be referred to as the "Agreement." The provisions of this Agreement apply to all Transactions which the Parties have entered or may enter into as principals and in respect of which the confirmation or other confirming evidence supplements, forms a part of or is subject to the terms of any Underlying Master Agreement. The Parties to this Agreement are the following:

**Name**: SemCrude, L.P. ("Party A")

**Name**:  BP Oil Supply Company ("BPOSC") ("Party B").

**Location of Chief Executive Office**:

BPOSC:  Warrenville, Illinois

State of Incorporation, Organization, or Formation of

BPOSC: Delaware

**All Notices of Default**:

Street:  6120 S. Yale Ave, Suite 700

City: Tulsa, OK    Zip: 74104

Attn: Vice President of Financial Services

Phone: (918) 524-8117
Facsimile: (918) 524-8290

**All Notices**:

Street: 28301 Ferry Road

City: Warrenville, IL   Zip: 60555

Attn: Credit Department
Facsimile: 630-836-5544

**All Confirmation Notices:**

Street: 28301 Ferry Road

City: Warrenville, IL 60555

Attention: Contracts

Facsimile: 866-546-5544

**Payments:  As set forth in the Underlying Master Agreements**
  Attn: _____
  Phone: _____
  Facsimile: _____

**Wire Transfer: As set forth in the Underlying Master Agreements**
  BNK: _____
  ABA: _____
  ACCT: _____

**Payments: As set forth in the Underlying Master Agreements**
  Attn: _____
  Phone: _____
  Facsimile: _____

**Wire Transfer: As set forth in the Underlying Master Agreements**
  BNK: _____
  ABA: _____
  ACCT: _____

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

**Credit and Collections:**
   Attn: VP of Financial Services
   Phone: 918-524-8117
   Facsimile: 918-524-8290

**With additional Notices concerning Performance Assurance to**: As set forth in the Underlying Master Agreements
Attn: As set forth in the Underlying Master Agreements
Phone: _____
Facsimile: _____

**With additional Notices of an MNA Default or Potential MNA Default to:**
   Attn: VP of Financial Services
   Phone 918-524-8117
   Facsimile: 918-524-8290

**Credit and Collections:**
   Attn: Manager, Credit Oil Americas
   Facsimile: 630-836-5544

**With additional Notices concerning Performance Assurance to**:
   Attn: As set forth in the Underlying Master Agreements
   Phone:_____
   Facsimile:_____

**With additional Notices of an MNA Default or Potential MNA Default to**:
   Attn: BP Legal Oil Americas
   Phone: : 630-836-5759
   Facsimile: 630-836-5544

**Underlying Master Agreements**

    ☒  BPOSC- SemCrude, L.P. ISDA Master Agreement dated April 25, 2008

    ☒  BPOSC –SemCrude, L.P. Master Net Settlement Agreement dated April 1, 2008

    ☒Other Agreements to be included as Underlying Master Agreements.  Specify:

Any other master agreements and/or trading agreements (in the nature of "forward contracts", "commodities contracts", and/or "swap agreements" as defined in Title 11 of the U.S. Bankruptcy Code) between Party A and any Party B Additional Related MNA Party for the purchase, sale and/or exchange of physical commodities, swaps, options, derivatives, or any other security, contract right, instrument or item (whether similar or dissimilar to the foregoing) that is currently bought, sold, and/or exchanged or capable of being bought, sold and/or exchanged in the future, and whether such Agreement or any Transaction thereunder is entered into before, on or after the Effective Date.

---

**Section Two**

| | |
|---|---|
| Indebtedness *(select one if Cross Default is selected in Section Three)* | ☐Option A |
| | ☐Option B |
| Interest Rates | Applicable Rate:    The "Prime Rate" under the table "Money Rates" as published by The Wall Street Journal minus 1%, means the rate per annum determined by the Non-defaulting Party at approximately 11:00 am (New York time) on the calculation date by reference to Wall Street Journal Rates for deposits in U.S. dollars for the period for which the Applicable |

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Rate is being calculated.

Default Rate:  The "Prime Rate" under the table "Money Rates" as published by The Wall Street Journal (or its successor) minus 3%.

Discount Rate:  To be determined by the calculating Party in a commercially reasonable manner.

| | |
|---|---|
| Settlement Amount *(select one)* | ☒Option A |
| | ☐Option B |

## Section Three

| | |
|---|---|
| MNA Default *(select one)* | ☐Option A |
| | ☒Option B; provided however, that only Section 3(d)(iv), (v), (ix)(4) and (6), and (x) shall apply. |
| | ☐Option C |
| **MNA Defaults** *(if MNA Default Option A or B is selected, customize MNA Default as follows; if MNA Default Option C is selected, skip to Section Four)* | |
| Payment Default *(if no Aggregate Delinquency Amount is specified, such amount shall be $0)* | Aggregate Delinquency Amount for Party A:  $0<br>Aggregate Delinquency Amount for Party B: $0 |
| Party Consolidation/Merger Default | ☒Transfer of Assets (Party) Option – Section 3(d)(v) |
| | ☒Creditworthiness of Resulting Entity (Party) Option – Section 3(d)(v)(B) |
| Cross Default | ☐Cross Default for Party A |
| | Cross-Default Amount 3% Shareholder's equity of Party A's Guarantor<br>Party A Material Affiliates: _____ |
| | ☐Cross Default for Party B |
| | Cross-Default Amount 3% of Shareholders equity of Party B's Guarantor<br>Party B Material Affiliates__The Guarantor_____ |
| Guarantor Consolidation/Merger Default | ☒Transfer of Assets (Guarantor) Option – Section 3(d)(ix)(4) |

6
Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

| | |
|---|---|
| Other Specified MNA Defaults: | ☒ Creditworthiness of Resulting Entity (Guarantor) Option – Section 3(d)(ix)(4)(B) |
| | ☐ Other MNA Defaults for Party A <br>     Specify:N/A_____ <br>     _____ |
| | ☐ Other MNA Defaults for Party B <br>     Specify: N/A <br>     _____ <br>     _____ |

---

**Section Four**

| | |
|---|---|
| Remedies *(select one)* | ☒ Option A <br>     ☐ Suspension Opt Out Option – Sections 4(b)(i) and 4(b)(ii)(A) shall NOT apply |
| | ☐ Option B |

---

**Section Five**

| | |
|---|---|
| Settlement | ☐ Security Interest Deletion Option - Sections 5(i) and 5(j) shall NOT apply |

---

**Section Six**

| | |
|---|---|
| Setoff | Party A Specified Affiliates: None |
| | Party B Specified Affiliates: None |

---

**Section Eight**

| | |
|---|---|
| Payment Allocation | ☒ Payment Allocation Option - Section 8(a) |
| Payment Netting | ☒ Payment Netting Option - Section 8(b) |

---

**Section Ten**

| | |
|---|---|
| Representations and Warranties | ☐ Security Interest Representation Deletion Option – Section 10(b) shall NOT apply |
| | ☐ FDICIA Representation Option – Section 10(c) |

---

**Section Eleven**

| | |
|---|---|
| Covenants | ☒ Financial Statements Option – Section 11(a) |

Version 1.1 <br> October 25, 2002
© Copyright 2002 by the Edison Electric Institute

☒ Negative Encumbrance Covenant Option – Section 11(b)

☐ Adequate Assurance Option – Section 11(c) and Section 3(d)(vii)
*(Adequate Assurance Option may NOT be selected if MNA Default Option C is selected)*

| **Section Twelve** | |
|---|---|
| UCC | ☐ Adequate Assurance Waiver Option – Section 12(b) |

| **Section Thirteen** | |
|---|---|
| Credit Event Deletion from Underlying Master Agreements: | ☒ Credit Event Deletion Option |

| **Section Twenty Two** | |
|---|---|
| Confidentiality | ☒ Confidentiality Option |

Other Special Provisions:

(1)     Delete Section 3(d) (i), (ii), (iii), (vi), (vii), (viii), and (ix)(1)-(3) and (5).

(2)     Insert "where "creditworthiness" shall be determined by the other Party in a commercially reasonable manner" after "merger, or transfer, if applicable" in the last line of Section 3(d)(v)(B).

(3)     Insert "where "creditworthiness" shall be determined by the other Party in a commercially reasonable manner" after "merger, or transfer, if applicable" in the last line of Section 3(d)(ix)(4)(B).

(4)     Delete "or any other Affiliate of Guarantor" from the fourth line of Section 3(d)(ix)(6).

(5)     At the end of Section 5(e) add the following:

"In the event that a Party shall dispute the MNA Final Settlement Amount payable to it, such Party shall accept payment of the MNA Final Settlement Amount and give notice of the dispute to the other Party stating the basis for the dispute; provided, however, that acceptance of such payment shall not constitute a waiver by the accepting Party of any right to dispute the amount of the MNA Final Settlement Amount."

(6)     Delete Section 5(j) in its entirety.

(7)     In Section 11(c) after "Eligible Collateral" add "or Other Eligible Support".

(8)     In Section 18(b) in the fourth line, insert the words "for assignment of the net amount due under this Agreement" prior to the words "as collateral security"; and

(9)     Delete "and taxes" from Section 27.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

IN WITNESS WHEREOF, the signatories below have caused this Master Agreement to be duly executed as of the Effective Date.

**PARTY A**

SemCrude, L.P.

By: _____

Name: *Michael J. Bascheti*

Title: *SVP of Finance*

**PARTY B**

BP Oil Supply Company

By: _____

Name: _____ Daniel Rosen

Title: _____ Strategic Credit Specialist

**SPECIFIED AFFILIATES' ACKNOWLEDGMENT AND AGREEMENT:**

Each Specified Affiliate signatory below represents and warrants, in connection with its execution of this MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT, as of the Effective Date and the date of each Transaction entered into after the Effective Date, that (i) it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation, formation, or organization and any other jurisdictions where its activities so require, has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary actions to authorize such execution, delivery, and performance; (ii) the person signing this Agreement on its behalf was duly authorized to do so on its behalf on the Effective Date; (iii) this Agreement, the Underlying Master Agreements, the Confirmations, and the Transactions to which it is a party constitute its legal, valid, and binding obligations, enforceable against it in accordance with their terms, subject to applicable bankruptcy, reorganization, insolvency, conservatorship, receivership, moratorium, or other similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law); and (iv) its execution and delivery of this Agreement does not contravene, or constitute a default under, any provision of applicable law or regulation (including, without limitation, any order, decree, judgment, injunction, or other judicial or governmental restriction applicable to such Party or any portion of its assets) or of the organizational documents of such Party, or of any material agreement, judgment, injunction, order, decree or other instrument binding upon such Party or result in the creation or imposition of any lien on any asset of such Party other than as provided herein.

**PARTY A SPECIFIED AFFILIATES:**

_____

By: _____

Name: _____

Title: _____


_____

By: _____

Name: _____

Title: _____

**PARTY B SPECIFIED AFFILIATES:**

_____

By: _____

Name: _____

Title: _____


_____

By: _____

Name: _____

Title: _____

9
Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

PARTY A'S GUARANTOR ACKNOWLEDGEMENT AND AGREEMENT:

SemGroup, L.P., as Guarantor of Party A, has issued the Guaranty on behalf of Party A dated January 17, **2008.**

SemGroup, L.P. acknowledges the execution of this MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT and agrees that: (a) the execution and delivery of this MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT by Party A is of material benefit to the Guarantor; (b) the Guaranty described above is not voided, rescinded, diminished, or adversely affected by this MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT; and (c) the Guaranty described above remains in fill force and effect in accordance with the terms and conditions contained therein.

SemGroup, L.P.
By its general partner
SemGroup, G.P., L.L.C.

By: _____

Name: Michael J. Brochetti

Title: Senior Vice President, Finance

PARTY *B*'S GUARANTOR ACKNOWLEDGEMENT AND AGREEMENT:

BP Corporation North America Inc. ("BPCNA"), as Guarantor of Party B, has issued the Guaranty on behalf of Party *B* dated April **25, 2008.**

BPCNA acknowledges the execution of this MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT and agrees that: (a) the execution and delivery of this MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT by Party B is of material benefit to the Guarantor; (b) the Guaranty described above is not voided, rescinded, diminished, or adversely affected by this MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT; and (c) the Guaranty described above remains in fill force and effect in accordance with the terms and conditions contained therein.

BP Corporation North America Inc.

By: _____

Name: ____**Daniel Rosen**_____

Title: ____**Strategic Credit**_____
_____**Specialist**_____

# MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT

## (Language in *italics* identifies Optional Provisions)

**WHEREAS,** the Parties have entered into and may after the Effective Date enter into one or more Underlying Master Agreements; and

**WHEREAS**, each Party desires to provide in this Master Netting, Setoff, Security, and Collateral Agreement (together with, and as amended by, the Cover Sheet, the Collateral Annex and the Credit Elections Cover Sheet, and any exhibits, schedules, and supplements hereto and thereto, this "Agreement") for, among other things, its right to terminate, liquidate, net, and set off all Obligations arising under the Underlying Master Agreements upon the occurrence of an MNA Default with respect to the other Party, and recover against the other Party under and across the Underlying Master Agreements as herein specified and to treat this Agreement, the Underlying Master Agreements, and all Transactions thereunder as a single agreement for the purposes set forth herein, whether or not the Obligations arising under the Underlying Master Agreements and Transactions thereunder are in connection with (a) cash settled Transactions or physically settled Transactions or (b) securities contracts, forward contracts, commodities contracts, repurchase agreements, swap agreements (as such terms are defined in Title 11 of the U.S. Bankruptcy Code (the "Code")), or other similar agreements; and

**WHEREAS,** each of the Parties has agreed to provide collateral and other credit support to secure the Obligations of such Party in respect of all the Underlying Master Agreements as provided in the Collateral Annex forming part of this Agreement; and

**WHEREAS,** the Parties desire that the provisions of each Underlying Master Agreement remain in force under each applicable Underlying Master Agreement to the extent such provisions are not expressly superceded or amended hereby.

**NOW THEREFORE,** in consideration of the mutual agreements herein made and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party agrees as follows:

**1.      Single Agreement.**   This Agreement is entered into in reliance on the Parties' agreement that for the purposes set forth herein this Agreement, the Underlying Master Agreements, and all the Confirmations and Transactions thereunder form a single integrated agreement between the Parties, and the Parties would not otherwise enter into this Agreement.

**2.      Definitions**.   Terms capitalized herein but not defined herein shall have the meanings given to such terms in the Collateral Annex. In the event of any conflict or inconsistency between a term defined herein and in any of the Underlying Master

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Agreements, such term as used in this Agreement shall govern and have the meaning ascribed to it in this Agreement for the purposes of this Agreement. All references to "$" shall be to lawful currency of the United States of America, unless otherwise specified. All references to Sections, Exhibits, and other provisions are to Sections, Exhibits and other provisions of this Agreement unless otherwise expressly stated. The following terms used in this Agreement are defined as follows:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For this purpose, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and/or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Aggregate Delinquency Amount" means, with respect to a Party, the amount specified as the Aggregate Delinquency Amount for such Party on the Cover Sheet.

"Agreement" has the meaning set forth in the second paragraph of this Master Netting, Setoff, Security, and Collateral Agreement.

"Applicable Rate" means the lesser of (i) the rate of interest per annum specified as the Applicable Rate on the Cover Sheet and (ii) the maximum interest rate, if any, that at any time and from time to time may be contracted for, taken, reserved, charged, or received under any applicable law.

"Bankruptcy" means, with respect to any Person, (i) the filing by such Person of a petition seeking to adjudicate such Person a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the commencement of an involuntary case or other proceeding against such Person seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to such Person or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official over such Person or any substantial part of its property, which involuntary case or other proceeding shall remain undismissed and unstayed for a period of 15 days; (iii) the making of an assignment or any general arrangement for the benefit of creditors; (iv) such Person's otherwise becoming bankrupt or insolvent (however evidenced); (v) such Person's generally being unable or admitting its inability to pay its debts as they fall due (or otherwise generally failing to pay its debts as they fall due); or (vi) such Person's

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

"Business Day" means any day except a Saturday, Sunday, or a Federal Reserve Bank holiday.

"Close-Out" means the acceleration, termination, and liquidation (including by way of automatic early termination) of one or more Transactions in accordance with this Agreement or the applicable Underlying Master Agreement.

"Code" has the meaning set forth in the second paragraph of this Agreement.

"Collateral Annex" means the Collateral Annex attached hereto and made a part of this Agreement.

"Comparable Provision" means any event of default, default, additional termination event, or similar provision in an Underlying Master Agreement or Transaction the remedy(ies) for which include(s) the Close-Out of all Transaction(s) under such Underlying Master Agreement and which is substantially similar to any of the events of default listed in Section 3(e). An event of default, default, additional termination event, or similar provision in an Underlying Master Agreement shall be a Comparable Provision notwithstanding that it may (i) employ non-identical wording, provided that it describes fundamentally the same or similar event or circumstance as an event of default listed in Section 3(e), (ii) provide for a different cure period, (iii) include or not include a materiality qualifier, or (iv) include or not include a creditworthiness test.

"Confirmation" means the documents and other confirming evidence exchanged between the Parties confirming a Transaction.

"Costs" means, with respect to the Non-defaulting Party, brokerage fees, commissions, and other out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (exclusive of Losses), expressed as a positive number, that the Non-defaulting Party incurs or would reasonably be expected to incur in connection with the termination of a Transaction pursuant to Section 4 hereof or of any hedges related thereto, or in connection with the replacement of a terminated Transaction.

"Cover Sheet" means the Master Netting, Setoff, Security, and Collateral Agreement Cover Sheet attached hereto and made a part of this Agreement.

"Cross Default Amount" means, with respect to a Party, the amount specified as the Cross Default Amount for such Party on the Cover Sheet.

"Default Rate" means the lesser of (i) the rate of interest per annum specified as the Default Rate on the Cover Sheet and (ii) the maximum interest rate, if any, that at any

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

time and from time to time may be contracted for, taken, reserved, charged, or received under any applicable law.

"Defaulting Party" means the Party with respect to which an MNA Default shall have occurred and be continuing, and if an MNA Default shall have occurred and be continuing in respect of both Parties, the Party that has first been given notice of its MNA Default (if such notice is a condition of such MNA Default) shall be the Defaulting Party.

"Discount Rate" means the lesser of (i) the rate of interest per annum specified as the Discount Rate on the Cover Sheet and (ii) the maximum interest rate, if any, that at any time and from time to time may be contracted for, taken, reserved, charged, or received under any applicable law.

"Early Termination Date" has the meaning set forth in Section 4.

"Effective Date" has the meaning set forth on the Cover Sheet.

"FDICIA" has the meaning set forth in Section 10(c).

"GAAP" has the meaning set forth in Section 10(a).

"Gains" means, with respect to any Transaction or group of Transactions, an amount determined by the Non-defaulting Party in a commercially reasonable manner and expressed as a negative number equal to the present value (discounted at the Discount Rate, if appropriate) of the economic benefit (exclusive of Costs) to it, if any, resulting from the termination of such Transaction or group of Transactions pursuant to Section 4 hereof, including at the election of the Non-defaulting Party but without duplication, any gain incurred as a result of its terminating, liquidating, obtaining, or reestablishing any hedge or related trading position. Nothing herein shall require the Non-defaulting Party to enter into a replacement transaction in order to determine its Gains.

"Guaranty" means the instrument or agreement pursuant to which a Guarantor guarantees payment or otherwise provides credit support for some or all of the Obligations of a Party.

"Guarantor" means, with respect to either Party, any other Person guaranteeing or otherwise providing credit support for some or all of the Obligations of such Party or of another Guarantor of such Party, including, without limitation, any credit support provider under any Underlying Master Agreement.

### *If INDEBTEDNESS OPTION A is selected on the Cover Sheet, the following definition shall apply:*

"Indebtedness" means, at any given time and with respect to any Person, whether the following are existing or future, whether there is recourse to all, a portion or none of the assets of such Person with respect to the following, or whether the following are

14

incurred as principal, guarantor, surety or otherwise, the aggregate total, without duplication, at any given time of (i) every obligation of such Person for money borrowed; (ii) every obligation of such Person evidenced by bonds, debentures, promissory notes, commercial paper or other similar instruments, including, without limitation, obligations incurred in connection with the acquisition of property, assets or businesses; (iii) every reimbursement obligation of such Person with respect to letters of credit, bankers' acceptances or similar facilities issued for the account of such Person; and (iv) all capitalized lease obligations of such Person.

**If INDEBTEDNESS OPTION B is selected on the Cover Sheet, the following definition shall apply:**

"Indebtedness" means, at any given time and with respect to any Person, any obligation of such Person (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of money.

"Losses" means, with respect to any Transaction or group of Transactions, an amount determined by the Non-defaulting Party in a commercially reasonable manner and expressed as a positive number equal to the present value (discounted at the Discount Rate, if appropriate) of the economic loss (exclusive of Costs) to it, if any, resulting from the termination of such Transaction or group of Transactions pursuant to Section 4 hereof, including any loss of bargain, cost of funding, or, at the election of the Non-defaulting Party but without duplication, any economic loss (other than Costs) incurred as a result of its terminating, liquidating, obtaining, or reestablishing any hedge or related trading position. Nothing herein shall require the Non-defaulting Party to enter into a replacement transaction in order to determine its Losses.

"MNA Default" has the meaning set forth in Section 3(a).

"MNA Final Settlement Amount" has the meaning set forth in Section 5(b).

"MNA Termination Notice" has the meaning set forth in Section 4.

"Material Affiliates" means, with respect to a Party, any Guarantor for such Party and those Persons designated on the Cover Sheet as Material Affiliates for such Party.

"No-Fault Termination Event" means any provision in an Underlying Master Agreement or Confirmation which describes an event or circumstance the remedy for which does not include the Close-Out of all Transaction(s) under such Underlying Master Agreement.

"Non-defaulting Party" means the Party other than the Defaulting Party.

"Obligation" or "Obligations" means, with respect to a Party, each and every present or future payment or performance obligation or liability of such Party under this

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Agreement, an Underlying Master Agreement or a Transaction, whether fixed, matured, unmatured, liquidated, or unliquidated.

"Parties" means Party A and Party B. "Party" means Party A or Party B, as applicable. Party A and Party B are identified on the Cover Sheet.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a joint venture, a trust, an unincorporated organization, or any other entity or organization, including a governmental entity or political subdivision or an agency or instrumentality thereof.

"Potential MNA Default" means any event or circumstance which, with the giving of notice or the passage of time or both, would constitute an MNA Default.

"Potential UMA Default" means any event or circumstance which, with the giving of notice or the passage of time or both, would constitute a UMA Default, and such term shall only apply if MNA Default OPTION A is selected.

"Receiving Party" has the meaning set forth in Section 9(b).

"Reference Market-Maker" means a leading dealer in the relevant market that is not an Affiliate of either Party selected by a Party determining any Settlement Amount in a commercially reasonable manner from among dealers of the highest credit standing which satisfy all the criteria that such Party applies generally at the time in deciding whether to offer or to make an extension of credit.

### *If SETTLEMENT AMOUNT OPTION A is selected on the Cover Sheet, the following definition shall apply:*

"Settlement Amount" means, with respect to a terminated Transaction or group of terminated Transactions, (i) the sum of (a) the amount calculated as a settlement amount with respect to such terminated Transaction or group of terminated Transactions in accordance with the methodology set forth in the Underlying Master Agreement governing such terminated Transaction or group of terminated Transactions, whether designated as a settlement payment, a termination payment or otherwise, and expressed as a positive number if owed to the Non-defaulting Party and expressed as a negative number if owed to the Defaulting Party; plus (b) without duplication of any amounts included in the foregoing, Costs; plus (c) without duplication of any amounts included in the foregoing, any Unpaid Amounts owed by the Defaulting Party to the Non-defaulting Party with respect to such terminated Transaction or group of terminated Transactions; minus (ii) without duplication of any amounts included in the foregoing, any Unpaid Amounts owed by the Non-defaulting Party to the Defaulting Party with respect to such terminated Transaction or group of terminated Transactions. If the applicable Underlying Master Agreement does not provide a methodology for the calculation of a settlement amount or termination amount for a terminated Transaction or group of terminated Transactions, the settlement amount to be used for purposes of clause (i)(a) of this

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

definition shall be determined by the Non-defaulting Party as the sum of Losses or Gains, as applicable, resulting from such terminated Transaction or group of terminated Transactions. Each Settlement Amount may be either a positive amount (if owed to the Non-defaulting Party) or a negative amount (if owed to the Defaulting Party).

> **If SETTLEMENT AMOUNT OPTION B is selected on the Cover Sheet, the following definition shall apply:**

"Settlement Amount" means, with respect to a terminated Transaction or group of terminated Transactions (and irrespective of any methodology for the calculation of settlement amount or termination payment (howsoever defined) set forth in any Underlying Master Agreement), (i) the sum of (a) Losses or Gains, as applicable, plus (b) without duplication of any amounts included in the foregoing, Costs; plus (c) without duplication of any amounts included in the foregoing, any Unpaid Amounts owed by the Defaulting Party to the Non-defaulting Party with respect to such terminated Transaction or group of terminated Transactions less (ii) without duplication of any amounts included in the foregoing, any Unpaid Amounts owed by the Non-defaulting Party to the Defaulting Party with respect to such termination Transaction or group of terminated Transactions. Each Settlement Amount may be either a positive amount (if owed to the Non-defaulting Party) or a negative amount (if owed to the Defaulting Party).

"Specified Affiliates" means those Persons, if any, designated on the Cover Sheet as Specified Affiliates for each of Party A and Party B, respectively.

"Transaction" or "Transactions" means each individual transaction governed by any Underlying Master Agreement entered into before, on, or after the Effective Date and in respect of which any Obligation of either Party remains unpaid or unperformed.

"Transferring Party" has the meaning set forth in Section 9(b).

"UCC" means the Uniform Commercial Code in effect in the State of New York as the same may be amended, restated, replaced or re-enacted from time to time.

"UMA Default" means any event of default or default (howsoever denominated) under an Underlying Master Agreement that is not replaced by Section 3(d) of this Agreement or does not constitute an MNA Default hereunder, and such term shall only apply if MNA Default OPTION A is selected.

"UMA Final Settlement Amount" means, with respect to each Underlying Master Agreement, the aggregate of all Settlement Amounts calculated for each terminated Transaction or group of terminated Transactions under such Underlying Master Agreement (determined by adding each of the Settlement Amounts that is expressed as a positive number and subtracting therefrom the absolute value of the sum of the Settlement Amounts that are expressed as a negative number).

"Underlying Master Agreement" means any of those agreements specified as Underlying Master Agreements on the Cover Sheet (and, to the extent so provided therein, the related schedules, exhibits, cover sheets or confirmations).

"Unpaid Amounts" means with respect to a Transaction, the amounts owed by one Party to the other under such Transaction that have not been paid as of the Early Termination Date whether or not such amounts are then due and payable, including, without duplication (i) invoiced amounts, (ii) uninvoiced amounts and/or amounts payable for physical deliveries or settlements that occurred prior to the Early Termination Date, and (iii) liquidated damages, taxes or other such costs or expenses to the extent an obligation to pay shall have accrued under this Agreement, the applicable Underlying Master Agreement, or the Confirmation relating to such Transaction on or prior to the Early Termination Date.

   **3.     MNA Default**.  As determined by the Parties' election on the Cover Sheet, "MNA Default" shall have the meaning and, where applicable, effect on each Underlying Master Agreement set forth below under the applicable option.

   **If MNA DEFAULT OPTION A is selected on the Cover Sheet, the following paragraphs (a) and (b) shall apply:**

   (a)     For purposes of this Agreement "MNA Default" shall have exclusively the meaning set forth in Section 3(d).

   (b)     To the extent that an MNA Default specified in Section 3(d) has a Comparable Provision in an Underlying Master Agreement, such Comparable Provision is deleted in its entirety and replaced with its applicable counterpart in Section 3(d); provided, however, that Section 3(d)(i) shall not replace any event of default arising from a Party's failure to pay an amount due in accordance with the applicable Underlying Master Agreement and such nonpayment which does not exceed the Aggregate Delinquency Amount when aggregated with all other such unpaid amounts shall be a "UMA Default" for purposes hereof.  Each such Underlying Master Agreement is hereby amended accordingly.

   **If MNA DEFAULT OPTION B is selected on the Cover Sheet, the following paragraphs (a) and (b) shall apply:**

   (a)     For purposes of this Agreement "MNA Default" shall have exclusively the meaning set forth in Section 3(d).

   (b)     The definition of MNA Default shall replace and supercede, in its entirety, any definition of event of default, default, additional termination event, breach, or other Close-Out event (howsoever denominated) in each Underlying Master Agreement the remedy for which includes the Close-Out of all Transactions under such Underlying Master Agreement or which causes automatically the Close-Out of all Transactions under an Underlying Master Agreement (taking into account the Parties' elections with respect

to Section 3(d) and Section 13). Each Underlying Master Agreement is hereby amended accordingly.

***If MNA DEFAULT OPTION C is selected on the Cover Sheet, the following paragraphs (a) and (b) shall apply:***

(a)     For purposes of this Agreement "MNA Default" shall have exclusively the following meaning:

> "MNA Default" means (a) any event set forth in Section 3(d)(ii), (iii), or (viii), but disregarding, for this purpose, all references therein to any Underlying Master Agreement(s), or (b) any event of default, default, additional termination event, breach, or other Close-Out event (howsoever denominated) in each Underlying Master Agreement, the remedy for which includes the Close-Out of all Transactions under an Underlying Master Agreement or which causes automatically the Close-Out of all Transactions under such Underlying Master Agreement (taking into account the Parties' elections with respect to Section 3(d) and Section 13).

(b)     The Parties agree that the definition of "MNA Default" in Section 3(a), above, shall not amend the Underlying Master Agreement(s), including, without limitation, the events of default specified in such Underlying Master Agreement(s).


(c)     Notwithstanding the provisions of Section 3(a) or Section 3(b) set forth in MNA Default OPTIONS A, B, or C (as applicable), the occurrence of an event that constitutes a No-Fault Termination Event or a UMA Default shall not be considered an MNA Default and shall not be amended hereby.  Any No-Fault Termination Event or UMA Default shall be subject to and shall give rise to only the rights or remedies set forth with respect to such No-Fault Termination Event or UMA Default in the Collateral Annex and the applicable Underlying Master Agreement.

(d)     Subject to the provisions of Section 3(a), "MNA Default" shall mean, with respect to a Defaulting Party, the occurrence of any of the following:

(i)     the failure by such Party to pay, when due, any amount required to be paid pursuant to any Underlying Master Agreement which, together with the amount of all such unpaid amounts (excluding any portion of any such payment(s) that is the subject of a good faith dispute), equals or exceeds the Aggregate Delinquency Amount, and all such unpaid amounts shall not be paid in full within three (3) Business Days after notice of such failure;

(ii)     any representation or warranty made or deemed to be made or repeated by such Party in this Agreement or any Underlying Master Agreement shall be false or misleading in any material respect when made or when deemed made or repeated;

(iii)     the failure by such Party to comply with or timely perform any material covenant or obligation set forth in this Agreement or any Underlying Master

19

Agreement (except to the extent that such failure (A) constitutes a separately enumerated MNA Default hereunder or (B), with respect to covenants and obligations arising under an Underlying Master Agreement, is excused by force majeure (as such term is defined in the applicable Underlying Master Agreement) and except for any failure to comply with such Party's obligations to physically deliver or receive a commodity, if the exclusive remedy for such failure under the applicable Underlying Master Agreement shall be the payment of money) if such failure is not capable of remedy or shall not be remedied within three (3) Business Days after of notice of such failure;

(iv)    the Bankruptcy of such Party or a Material Affiliate of such Party;

*If the **TRANSFER OF ASSETS (PARTY) OPTION** is selected on the Cover Sheet, the following paragraph 3(d)(v) shall apply:*

(v)    such Party shall consolidate or amalgamate with, or merge with or into, or transfer all or substantially all its assets to another entity, and, (A) prior to effecting such consolidation, amalgamation, merger, or transfer the resulting, surviving, or transferee entity (I) shall fail to agree to assume all the Obligations of such Party under this Agreement and the Underlying Master Agreements by operation of law or pursuant to an agreement reasonably satisfactory to the other Party; or (II) shall fail to cause the benefits of any Guaranty to extend to the payment by such resulting, surviving, or transferee entity of any such Obligations pursuant to documentation reasonably satisfactory to the other Party;

*If the **TRANSFER OF ASSETS (PARTY) OPTION** is NOT selected on the Cover Sheet, the following paragraph 3(d)(v) shall apply:*

(v)    such Party shall consolidate or amalgamate with, or merge with or into another entity, and, (A) prior to effecting such consolidation, amalgamation, or merger, the resulting or surviving entity (I) shall fail to agree to assume all the Obligations of such Party under this Agreement and the Underlying Master Agreements by operation of law or pursuant to an agreement reasonably satisfactory to the other Party; or (II) shall fail to cause the benefits of any Guaranty or replacement Guaranty to extend to the payment by such resulting or surviving entity of any such Obligations pursuant to documentation reasonably satisfactory to the other Party;

*If the **CREDITWORTHINESS OF RESULTING ENTITY (PARTY) OPTION** is selected on the Cover Sheet, the following paragraph (B) shall also apply to Section 3(d)(v):*

*or (B) the creditworthiness of such resulting, surviving, or transferee entity shall be materially weaker than that of such Party immediately before such consolidation, amalgamation, merger, or transfer, if applicable;*

*If the **CROSS DEFAULT OPTION** is selected on the Cover Sheet, the following paragraph 3(d)(vi) shall apply:*

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

(vi) (A) a default, event of default, or other similar condition or event in respect of such Party or any of its Material Affiliates under one or more agreements or instruments with respect to any Indebtedness of such Party or such Material Affiliate in an aggregate amount of not less than the Cross Default Amount shall have occurred and be continuing, which results in such Indebtedness becoming, or becoming capable at such time of being declared, immediately due and payable, or (B) a default by such Party or any of its Material Affiliates in making one or more payments on the due date therefor, individually or collectively, in an aggregate amount of not less than the Cross Default Amount under such agreements or instruments;

***If the ADEQUATE ASSURANCE OPTION in Section 12(b) is selected on the Cover Sheet, the following paragraph (vii) shall also apply:***

(vii)   such Party shall fail to comply with its obligations in accordance with Section 11(c);

(viii) with respect to the Collateral Annex or any other credit support arrangements between the Parties with respect to any Obligations, (A) such Party shall fail to make any required Transfer of Performance Assurance pursuant to the Collateral Annex or any required transfer of credit support pursuant to such other credit support arrangements, or (B) such Party shall fail to comply with restrictions set forth in Paragraph 6(a) of the Collateral Annex or any similar provision in any other credit support arrangement; and, in each case, such failure shall not be remedied within one (1) Business Day after receipt of notice of such failure; provided, however, that such cure period shall not apply to a Party's obligation to Transfer Performance Assurance pursuant to Paragraphs 6(b)(i) and (iii) of the Collateral Annex;

(ix) with respect to any Guarantor of such Party:

(1)     any representation or warranty made or deemed to be made or repeated by such Guarantor in connection with its Guaranty shall be false or misleading in any material respect when made or when deemed made or repeated;

(2)     the failure of such Guarantor to pay, when due, any amount required pursuant to its Guaranty if such amount shall not be paid in full within three (3) Business Days after notice of such failure;

(3)     the failure of such Guarantor to comply with or timely perform any material covenant or obligation set forth in its Guaranty if such failure is not capable of remedy or shall not be remedied within three (3) Business Days after notice of such failure;

***If the TRANSFER OF ASSETS (GUARANTOR) OPTION is selected on the Cover Sheet, the following paragraph 3(d)(ix)(4) shall also apply:***

(4)     such Guarantor shall consolidate or amalgamate with, or merge with or into, or transfer all or substantially all of its assets to another entity, and (A) a

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Party, on behalf of its Guarantor, prior to effecting such consolidation, amalgamation, merger, or transfer (I) shall not provide to the other Party the Guarantor's documentation demonstrating that the resulting, surviving, or transferee entity has agreed to assume all the Obligations of such Guarantor by operation of law or pursuant to an agreement reasonably satisfactory to the other Party; or (II) shall not otherwise cause the benefits of any Guaranty or replacement Guaranty of such Guarantor to extend to the payment by such Party of its Obligations pursuant to documentation reasonably satisfactory to the other Party;

**If the TRANSFER OF ASSETS (GUARANTOR) OPTION is NOT selected on the Cover Sheet, the following paragraph 3(d)(ix)(4) shall also apply:**

(4)    such Guarantor shall consolidate or amalgamate with, or merge with or into, another entity, and (A) a Party, on behalf of its Guarantor, prior to effecting such consolidation, amalgamation, or merger, (I) shall not provide to the other Party the Guarantor's documentation demonstrating that the resulting or surviving entity has assumed all the Obligations of such Guarantor by operation of law or pursuant to an agreement reasonably satisfactory to the other Party; or (II) shall not otherwise cause the benefits of any Guaranty of such Guarantor to extend to the payment by such Party of its Obligations pursuant to documentation reasonably satisfactory to the other Party;

**If the CREDITWORTHINESS OF RESULTING ENTITY (GUARANTOR) OPTION is selected on the Cover Sheet, the following paragraph (B) shall also apply to Section 3(d)(ix)(4):**

or (B) the creditworthiness of such resulting, surviving, or transferee entity shall be materially weaker than that of such Guarantor immediately before such consolidation, amalgamation, merger, or transfer, if applicable;

(5)    the satisfaction of all Obligations of the Party to which such Guaranty relates without the failure of such Guarantor's Guaranty to be in full force and effect and enforceable in accordance with its terms against such Guarantor at any time prior to the written consent of the other Party; or

(6)    such Guarantor shall repudiate, disaffirm, disclaim, or reject, in whole or in part, or challenge the validity of, its Guaranty, provided, however, that any reservation by Guarantor to itself of all rights, set-offs, counterclaims and other defenses to which the guaranteed Party or any other Affiliate of Guarantor is or may be entitled to arising from or out of the Guaranty and/or the Underlying Master Agreement or at law or in equity, except for defenses arising out of the bankruptcy, insolvency, dissolution, or liquidation of the guaranteed Party, or defenses previously waived shall not in and of itself constitute any such repudiation, disaffirmation, disclaimer, rejection, or challenge.

(x) any other MNA Defaults specified with respect to such Party on the Cover Sheet.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

4. **Remedies**.

*If REMEDIES OPTION A is selected on the Cover Sheet, the following paragraphs (a) and (b) shall apply:*

(a)     The rights and remedies of the Non-defaulting Party under this Agreement upon the occurrence and continuance of an MNA Default or a Potential MNA Default shall replace and supercede all rights and remedies of such Party under an Underlying Master Agreement with respect to the event giving rise to the MNA Default or the Potential MNA Default, subject to the election on the Suspension Opt Out Option, other than provisions therein relating to (i) if Settlement Amount Option A is selected, the calculation of the Settlement Amount; (ii) the reimbursement of expenses or other indemnification; and (iii) setoff, netting or recoupment.

*If SUSPENSION OPT OUT OPTION is selected on the Cover Sheet, the following paragraphs (b)(i) and (b)(ii)(A) shall NOT apply and, notwithstanding Section 4(a), the Non-defaulting Party may exercise the remedy of suspension as set forth in the applicable Underlying Master Agreement:*

(b)     (i)     If a Potential MNA Default shall have occurred and be continuing with respect to a Party, the other Party shall have the right, upon one (1) Business Day's prior notice, to withhold any payments and/or suspend performance under any or all Transactions under any or all Underlying Master Agreements, provided, however, that the right to suspend payment and/or performance under any or all Transactions shall be limited to a single five (5) day period.

(ii)     If an MNA Default shall have occurred and be continuing, the Non-defaulting Party shall have the right to: (A) withhold any payments and/or suspend performance under any or all Transactions under any or all of the Underlying Master Agreements, provided, however, that the right to suspend payment and/or performance under any or all Transactions shall be limited to a single fourteen (14) day period, unless an Early Termination Date shall have been declared (in which event suspension of payment and performance may continue until such Early Termination Date); (B) exercise rights of setoff, netting, or recoupment pursuant to this Agreement or any Underlying Master Agreement; (C) retain, draw on, liquidate or apply any Performance Assurance in accordance with the terms of this Agreement, including Paragraph 7 of the Collateral Annex; (D) give notice to the Defaulting Party (the "MNA Termination Notice") specifying the relevant MNA Default and that the Non-defaulting Party is exercising its rights pursuant to this Agreement, declaring the Defaulting Party in default under all Underlying Master Agreements and all Transactions thereunder, and designating a day, no earlier than the day such notice is effective and no later than 20 days after such notice is effective, as an early termination date ("Early Termination Date") provided, however, that, if the Non-defaulting Party has elected to give an MNA Termination Notice, the Non-defaulting Party shall not be permitted to terminate less than all Transactions under all Underlying Master Agreements as a result of an MNA Default under this Agreement

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

(except as provided in Section 5 for those Transactions that are impracticable or illegal to terminate); or (E) take any other action permitted at law or in equity.

***If REMEDIES OPTION B is selected on the Cover Sheet, the following paragraphs (a) and (b) shall apply:***

(a)     Subject to Section 4(b), if an MNA Default shall have occurred and be continuing, the Non-defaulting Party shall have the right to: (A) exercise any and all rights and remedies set forth in the applicable Underlying Master Agreement with respect to the event giving rise to the MNA Default other than any right to Close-Out the Transactions under such Underlying Master Agreement as a result of any event giving rise to such MNA Default (it being understood that a Party may not Close-Out any Transaction under any Underlying Master Agreement as a result of any event giving rise to an MNA Default except as provided in this Agreement), (B) retain, draw on, liquidate or apply any Performance Assurance in accordance with the terms of this Agreement, including Paragraph 7 of the Collateral Annex; (C) take any other action permitted at law or in equity, in each case, until the Non-defaulting Party gives to the Defaulting Party the MNA Termination Notice, or (D) give notice to the Defaulting Party (the "MNA Termination Notice") specifying the relevant MNA Default and that the Non-defaulting Party is exercising its rights pursuant to this Agreement, declaring the Defaulting Party in default under all Underlying Master Agreements and all Transactions thereunder, and designating a day, no earlier than the day such notice is effective and no later than 20 days after such notice is effective, as an early termination date (the "Early Termination Date"); provided, however, that, if the Non-defaulting Party has elected to give an MNA Termination Notice, the Non-defaulting Party shall not be permitted to terminate less than all of the Transactions under all Underlying Master Agreements as a result of an MNA Default under this Agreement (except as provided in Section 5 for those Transactions that are impracticable or illegal to terminate).

(b)     Upon the designation of an Early Termination Date pursuant to this Agreement as provided in Section 4(a), the rights and remedies of the Non-defaulting Party under this Agreement upon the occurrence and continuance of the MNA Default shall replace and supercede the rights and remedies of the Non-defaulting Party under the applicable Underlying Master Agreement with respect to the event giving rise to the MNA Default, other than provisions therein relating to (A) if Settlement Amount Option A is selected, the calculation of Settlement Amount; (B) the reimbursement of expenses or other indemnification; and (C) set-off, netting or recoupment.

(c)     After delivery of the MNA Termination Notice to the Defaulting Party, the Non-defaulting Party shall have the right to (i) withhold any payments and/or suspend performance of the Non-defaulting Party's Obligations to the Defaulting Party; (ii) exercise rights to retain, draw on, liquidate, or apply any Performance Assurance in accordance with the terms of this Agreement, including Paragraph 7 of the Collateral Annex; (iii) exercise rights of setoff, netting and/or recoupment pursuant to this Agreement or any Underlying Master Agreement; or (iv) take any other action permitted at law or in equity.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

(d)     Notwithstanding any contrary provision of Sections 4 or 5, if the Non-defaulting Party has given an MNA Termination Notice, but any Transaction under an Underlying Master Agreement has automatically Closed-Out according to its terms on or prior to the Early Termination Date specified in such MNA Termination Notice, such Closed-Out Transaction shall nonetheless be subject to this Agreement and the Settlement Amount for such Closed-Out Transaction shall be included in the MNA Final Settlement Amount to the extent not already paid to the relevant Party.

## 5.     Settlement.

(a)     As of the Early Termination Date, (i) all the Transactions under all the Underlying Master Agreements shall be Closed-Out (or, to the extent that in the commercially reasonable judgment of the Non-defaulting Party it is commercially impractical or illegal to Close-Out certain of such Transactions or certain of such Transactions may not be Closed-Out under applicable law on the Early Termination Date, such Transactions shall instead be Closed-Out on the date or dates determined by the Non-defaulting Party occurring as soon after the Early Termination Date as is reasonably practicable), subject to the rights of set-off, off-set, and retention as may be provided for herein or in any applicable Underlying Master Agreement; provided, however, that if an Obligation is unascertainable, the Non-defaulting Party may, acting in a commercially reasonable manner, estimate the amount of such Obligation and setoff in respect of the estimate, subject to accounting to the Defaulting Party when the Obligation is ascertained, and (ii) the Non-defaulting Party shall calculate the Settlement Amount for each terminated Transaction or group of terminated Transactions and determine the UMA Final Settlement Amount with respect to each Underlying Master Agreement.

(b)     The "MNA Final Settlement Amount" shall be the sum of the UMA Final Settlement Amounts (i) if the sum of the UMA Final Settlement Amounts is positive, reduced by any amount received by the Non-defaulting Party to the extent Non-defaulting Party shall exercise its rights to apply Performance Assurance in accordance with the Collateral Annex or (ii) if the sum of the UMA Final Settlement Amounts is negative, added to the value of any Performance Assurance held by the Defaulting Party.  If the MNA Final Settlement Amount is a positive amount, then such amount shall be owed by the Defaulting Party to the Non-defaulting Party; and if the MNA Final Settlement Amount is a negative amount, then the absolute value of such amount shall be owed by the Non-defaulting Party to the Defaulting Party, subject to the rights of the Non-defaulting Party to set-off, recoup, withhold or suspend payment as set forth in this Agreement.

(c)     Upon determination of the MNA Final Settlement Amount by the Non-defaulting Party, the Non-defaulting Party shall provide the Defaulting Party with a statement showing the calculation of the MNA Final Settlement Amount (including the calculation of the Settlement Amounts relating to each Transaction or group of Transactions, each UMA Final Settlement Amount, any amounts setoff in accordance herewith, and the application of Performance Assurance).  Subject to Section 5(f), the MNA Final Settlement Amount, plus, to the extent not already accounted for in the MNA

25

Final Settlement Amount, interest on the MNA Final Settlement Amount at the Applicable Rate from, and including, the Early Termination Date to, but excluding, the date such amount is due pursuant to this subsection calculated on the basis of the actual number of days elapsed, shall be payable by wire transfer in immediately available funds by the Party from whom such payment is due on the third Business Day after the date on which such statement of the MNA Final Settlement Amount is provided to the Defaulting Party by the Non-defaulting Party.

(d)     If all or any portion of the MNA Final Settlement Amount or interest thereon is not paid when due, then the unpaid amount shall bear interest from, and including, the date due to, but excluding, the date the MNA Final Settlement Amount is paid in full, at a rate per annum equal to the Default Rate, calculated on the basis of the actual number of days elapsed.

(e)     In the event a Party shall dispute the MNA Final Settlement Amount payable by it, such Party shall, within the time prescribed herein, pay the MNA Final Settlement Amount and give notice of the dispute to the other Party stating the basis for the dispute.

(f)     Nothing in this Section 5 shall be construed to restrict or preclude the Party to whom the MNA Final Settlement Amount is owed from realizing on Performance Assurance held by such Party at any time upon and during the continuance of an MNA Default, notwithstanding (and without awaiting the outcome of) any dispute as to the MNA Final Settlement Amount. Notwithstanding the foregoing, if the Non-defaulting Party shall owe the MNA Final Settlement Amount to the Defaulting Party, the Non-defaulting Party shall not be required to pay the MNA Final Settlement Amount to the Defaulting Party until (i) the Non-defaulting Party receives confirmation satisfactory to it in its reasonable discretion that all other obligations of the Defaulting Party or its Specified Affiliates to the Non-defaulting Party or its Specified Affiliates under any other agreements, instruments or undertakings between the Defaulting Party or its Specified Affiliates and the Non-defaulting Party or its Specified Affiliates which are owed (as such term is defined in Section 6(c)) as of the applicable payment date have been paid (or netted or set off) in full; and (ii) the Defaulting Party executes a release in a form satisfactory to the Non-defaulting Party that resolves finally the amounts due and owing as the MNA Final Settlement Amount under the terms of this Agreement, the Underlying Master Agreements, and all Transactions. To the extent that either Party reasonably believes that bankruptcy court approval of any such release is required, the Non-defaulting Party may suspend payment under this subsection until such time as appropriate court approval has been obtained and is final and non-appealable, and interest will accrue on any payments so suspended at the Applicable Rate from the due date until payment.

(g)     The Parties agree that if the Settlement Amounts are determined with respect to any terminated Transaction or group of Terminated Transactions as set forth herein, the MNA Final Settlement Amount is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against

26

future risks and, except as otherwise provided in this Agreement, neither Party will be entitled to recover any additional damages as a consequence of such losses.

(h)     The Non-defaulting Party shall be under no obligation to prioritize the order with respect to which it exercises any one or more rights and remedies available hereunder or under any Underlying Master Agreement. The Defaulting Party shall in all events remain liable to the Non-defaulting Party for any amount payable by the Defaulting Party in respect of any of its Obligations remaining unpaid after the exercise of such rights and remedies.

*If SECURITY INTEREST DELETION OPTION is selected on the Cover Sheet, the following paragraphs (i) and (j) shall NOT apply and, except as provided in the Collateral Annex, nothing herein shall create a charge or other security interest:*

(i)     As additional security for the prompt and complete payment and netting of the Obligations of a Party (the "Pledgor") to the other Party (the "Pledgee"), each Party, as Pledgor, hereby pledges, assigns, conveys and transfers to the other Party, as Pledgee, and hereby grants to the other Party a present and continuing security interest in and to, and a general first lien upon and right of set off against, all right, title, and interest of the Pledgor in any Obligations of the Pledgee owed to the Pledgor, together with all accounts and general intangibles and payment intangibles in respect of such Obligations and all dividends, interest, and other proceeds from time to time received, receivable, or otherwise distributed in respect of, or in exchange for, any or all of the foregoing (together, the "Pledged Collateral"). In the event that an MNA Default with respect to the Pledgor shall have occurred and be continuing, the Pledgee may, in its sole discretion, exercise any one or more of the rights and remedies provided under this Agreement or as otherwise available under applicable law, including, without limitation, any of the following rights and remedies:

(i) all rights and remedies available to a secured party under the UCC and other applicable laws with respect to its Pledged Collateral;

(ii) the right to set off any amount of its Pledged Collateral against and in satisfaction of any amount payable by the Pledgor in respect of any of its Obligations; and

(iii) the right to foreclose upon its Pledged Collateral through one or more public or private sales or other dispositions with such notice, if any, as may be required by applicable law (which notice is hereby waived by the Pledgor to the full extent permitted by applicable law), free from any claim or right of any nature whatsoever of the Pledgor, including any right of equity or redemption by the Pledgor (with the Pledgee having the right to purchase any or all of the Pledged Collateral to be sold) and to apply the proceeds from the liquidation of such Pledged Collateral to and in satisfaction of any amount payable by the Pledgor in respect of any of its Obligations in such order as the Pledgee may elect.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

(j)     The Pledgor hereby irrevocably constitutes and appoints the Pledgee and any officer or agent thereof, with full power of substitution, as the Pledgor's true and lawful attorney-in-fact with full irrevocable power and authority to act in the name, place and stead of the Pledgor or in the Pledgee's own name, from time to time in the Pledgee's discretion, for the purpose of taking any and all action and executing and delivering any and all documents or instruments which may be necessary or desirable to accomplish the purposes of Section 5(i), or otherwise carry out the rights and remedies granted hereby to Pledgee.

## 6.     Setoff.

(a)     Upon the Non-defaulting Party's exercise of its rights under Section 4 and the determination of the MNA Final Settlement Amount or the UMA Final Settlement Amount under each Underlying Master Agreement, the Non-defaulting Party may, without further notice, setoff any such MNA Final Settlement Amount or UMA Final Settlement Amounts against (including by set off, offset, combination of accounts, deduction, retention, counterclaim, or withholding across or within each or all of the Underlying Master Agreements) (i) any amounts owed by the Defaulting Party or any of its Specified Affiliates to the Non-Defaulting Party or any of its Specified Affiliates under any other agreements, instruments or undertakings between the Defaulting Party or its Specified Affiliates and the Non-defaulting Party or its Specified Affiliates or (ii) any amounts owed by the Non-defaulting Party or any of its Specified Affiliates to the Defaulting Party or any of its Specified Affiliates under any other agreements, instruments or undertakings between the Defaulting Party or its Specified Affiliates and the Non-defaulting Party or its Specified Affiliates.  If an amount is unascertainable, the Non-defaulting Party may, acting in a commercially reasonable manner, estimate the amount thereof and setoff in respect of the estimate, subject to accounting to the Defaulting Party when the amount is ascertained.

(b)     The right of setoff provided for in Section 6(a) is in addition to but without duplication of, and not in limitation of, any other right or remedy available to the Non-defaulting Party (including, without limitation, any right of setoff, offset, combination of accounts, deduction, counterclaim, retention, or withholding), whether arising under this Agreement, any Underlying Master Agreement, any Confirmation, any Guaranty or other credit support document, or any other agreement, under applicable law, in equity, or otherwise.

(c)     For purposes of this Section 6 and Section 5, owed means, as of any date of determination, any amounts invoiced, capable of being invoiced, or accrued as of such date.  The Non-defaulting Party shall give the Defaulting Party notice of any setoff pursuant to this Section 6, as soon as practicable thereafter, <u>provided</u> that failure to give such notice shall not affect the validity of the setoff.

7.     **Currency.**  For purposes of determining the Settlement Amount with respect to any terminated Transaction or group of terminated Transactions, the Non-defaulting Party shall calculate such amount in the currency specified for such

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Transaction or group of Transactions in the applicable Underlying Master Agreement. For purposes of calculating the MNA Final Settlement Amount, the Non-defaulting Party shall convert all of the Settlement Amounts to United States Dollars, and all payments required to be made under this Agreement shall be made in United States Dollars. Currency conversions shall be made at the rate of exchange at which the Non-defaulting Party, acting in a commercially reasonable manner, would be able to purchase with United States Dollars the relevant amount of the currency being converted two (2) days prior to the date on which the MNA Final Settlement Amount is due.

## 8.    Payment Allocation; Payment Netting.

*If the PAYMENT ALLOCATION OPTION is selected on the Cover Sheet, the following paragraph (a) shall apply:*

(a)    If at any time a Party fails to designate the Obligations to which a payment is to be allocated under the various Underlying Master Agreements or Transactions, the other Party may allocate the payment in its sole commercially reasonable discretion among the amounts due under the Underlying Master Agreements and/or Transactions.

*If the PAYMENT NETTING OPTION is selected on the Cover Sheet, the following paragraph (b) shall apply:*

(b)    Notwithstanding anything to the contrary in any Underlying Master Agreement, in respect of all Transactions under any such Underlying Master Agreement, the Parties agree that if on any date amounts, including, without limitation, payment Obligations, debts, related damages, interest or credits, are due and payable in the same currency, and in respect of the same Underlying Master Agreement by each Party to the other, then, on such date, each Party's Obligation to make payment of any such amounts will be automatically satisfied and discharged by netting the aggregate amount payable by one Party against the aggregate amount payable by the other Party and replacing those payment obligations with a single payment obligation of the Party owing the larger such aggregate amount to pay the net difference between such aggregate amounts to the other Party on the applicable payment date by wire transfer of immediately available funds. The Parties shall cooperate to calculate the aggregate mutual amounts due and payable to or from each Party by examining the payments due on each applicable payment date and determining which Party is the net payer and which is the net receiver.

## 9.    Collateral.

(a)    Subject to Section 23(c), the provisions set forth in this Agreement (including the Collateral Annex) shall supercede and replace any provisions of all Underlying Master Agreements and all Transactions to the extent they relate to the determination, delivery, return, administration, and application of any Performance Assurance, collateral or other form of credit support other than any guaranty, except that any right of either Party to realize on or apply any collateral pursuant to the terms of any Underlying Master Agreement or any Transaction upon (i) a UMA Default, (ii) a No-

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Fault Termination Event, or (iii) an MNA Default shall remain in full force and effect with respect to Performance Assurance, collateral, and other form of credit support. Notwithstanding anything to the contrary contained in any Underlying Master Agreement or in any documentation comprising or pertaining to Performance Assurance, collateral, or other related credit support and, subject to Section 23(c), the determination and application of collateral requirements and rights shall be in accordance with this Agreement so long as this Agreement is in force and effect.

(b)     Subject to Section 23(c), any Performance Assurance, collateral or other forms of credit support provided (before, on, or after the date of this Agreement) in respect of any Obligations, by or on behalf of any Party (the "Transferring Party") to the other Party (the "Receiving Party"), shall secure the aggregate of the Obligations of the Transferring Party to the Receiving Party and the administration of such Performance Assurance, collateral or other forms of credit support shall be governed by the Collateral Annex as of the Effective Date of this Agreement.

**10.     Representations and Warranties.**

(a)     As of the Effective Date and the date of each Transaction entered into after the Effective Date, each Party represents and warrants to the other Party that (i) it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation, formation, or organization and any other jurisdictions where its activities so require, has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary actions to authorize such execution, delivery, and performance; (ii) the person signing this Agreement on its behalf was duly authorized to do so on its behalf on the Effective Date; (iii) this Agreement, the Underlying Master Agreements for which there exist any outstanding Obligations, the Confirmations, and the Transactions to which it is a party constitute its legal, valid, and binding obligations, enforceable against it in accordance with their terms, subject to applicable bankruptcy, reorganization, insolvency, conservatorship, receivership, moratorium, or other similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law); (iv) its execution and delivery of this Agreement does not contravene, or constitute a default under, any provision of applicable law or regulation (including, without limitation, any order, decree, judgment, injunction, or other judicial or governmental restriction applicable to such Party or any portion of its assets) or of the organizational documents of such Party, or of any material agreement, judgment, injunction, order, decree or other instrument binding upon such Party or result in the creation or imposition of any lien on any asset of such Party other than as provided herein; (v) the financial statements from time to time provided by it to the other Party pursuant to this Agreement are prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied (except as expressly set forth therein) and fairly present its financial condition as of the date of such statements; and (vi) the jurisdiction of its incorporation, formation, or

organization and the location of its chief executive office are correctly set forth on the Cover Sheet.

*If SECURITY INTEREST REPRESENTATION DELETION OPTION is selected on the Cover Sheet, the following paragraph (b) shall NOT apply:*

(b)     As of the Effective Date and the date of each Transaction entered into after the Effective Date, each Party represents and warrants to the other Party that it has not granted a security interest in or to, a general first lien upon, or otherwise encumbered any of its Obligations nor any accounts, payment intangibles, or general intangibles in respect of such Obligations, nor dividends, interest, or proceeds thereof from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of the foregoing, except as provided in Section 5(i), if applicable, or as permitted by Section 18(b).    Furthermore, the Parties agree and acknowledge that the above representation serves to induce each Party to enter into and maintain this Agreement and that in the absence of such representation, neither Party would enter into this Agreement.

*If FDICIA REPRESENTATION OPTION is selected on the Cover Sheet, the following paragraph (c) shall apply:*

(c)     As of the Effective Date and the date of each Transaction entered into after the Effective Date, each Party represents and warrants to the other Party that it is a "financial institution" as defined in and pursuant to Title VI of the Federal Deposit Insurance Corporation Improvement Act of 1991, as amended ("FDICIA"). Each Party intends that this Agreement constitute a "netting contract" as defined in and subject to FDICIA, and each payment entitlement and payment obligation under this Agreement constitutes a "covered contractual payment entitlement" and "covered contractual payment obligation," respectively, as defined in and subject to FDICIA.

**11.     Covenants.**

*If FINANCIAL STATEMENTS OPTION is selected on the Cover Sheet, the following paragraph (a) shall apply:*

(a)     Each Party agrees to deliver to the other Party for its Guarantor or, if none, for itself, to the extent not publicly available, (i) annual audited financial statements prepared in accordance with GAAP, and (ii) quarterly unaudited consolidated financial statements prepared in accordance with GAAP (subject to normal year-end adjustments and the omission of footnotes), which fairly present such Person's financial condition as of the date of such financial statements, in each case promptly upon request by the other Party (but with no obligation to provide earlier than 120 days after the end of each fiscal year or 60 days after the end of each fiscal quarter).  To the extent any provision of an Underlying Master Agreement requires either Party to provide financial statements for itself or with respect to its Guarantor, this Section 11(a) supercedes and replaces such provision. Notwithstanding any provision contained herein, if any provision from any

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Underlying Master Agreement requires delivery of financial statements for any Person other than a Party or its Guarantor, such provision shall continue in full force and effect.

*If NEGATIVE ENCUMBRANCE OPTION is selected on the Cover Sheet covenant, the following paragraph (b) shall apply:*

(b)    Each Party agrees that it will not grant, create or suffer to exist any security interest in, or lien upon, or otherwise encumber, any of its rights, duties or Obligations under any Underlying Master Agreement or this Agreement that under the UCC would constitute accounts, payment intangibles or general intangibles or any dividends, interest, or proceeds from time to time received, or receivable or otherwise distributed in respect of, or in exchange for, any or all of the foregoing, except as provided in Section 5(i), if applicable, or as permitted by Section 18(b).

*If ADEQUATE ASSURANCES OPTION is selected on the Cover Sheet and MNA Default OPTION C is NOT selected, the following paragraph (c) shall apply:*

(c)    Each Party ("<u>X</u>") agrees that it will provide adequate assurance to the other Party ("<u>Y</u>") of X's ability to perform all of its outstanding Obligations under any Underlying Master Agreement or any Transaction thereunder on or before the second Business Day after a request for such assurance is made by Y when Y has reasonable grounds for insecurity.   If adequate assurance is provided in the form of Eligible Collateral, then it shall be held and administered as Performance Assurance for purposes of Paragraphs 2, 6, 7 and 9 of the Collateral Annex.

**12.    UCC.** (a) Each Party agrees that, unless the Adequate Assurance Waiver OPTION below is selected, the provisions of Article 2-609 of the UCC shall apply.

*If ADEQUATE ASSURANCE WAIVER OPTION is selected on the Cover Sheet, the following paragraph (b) shall apply:*

(b)    Each Party agrees that notwithstanding any provisions of law relating to adequate assurance of future performance, including, without limitation, Article 2-609 of the UCC, the Parties shall only be entitled to request adequate assurance as specifically provided in this Agreement.

*If CREDIT EVENT DELETION OPTION is selected on the Cover Sheet, the following Section 13 shall apply:*

**13.    Credit Event Deletion.** Notwithstanding the provisions of Section 3(a) or Section 3(b) set forth in MNA Default OPTION A, B, or C (as applicable) or Section 3(c), any and every provision in any Underlying Master Agreement that permits or requires termination of, or creates any obligations under, such Underlying Master Agreement or any Transaction thereunder on the occurrence of any credit rating downgrade or loss of shareholder equity, or the breach of any financial covenant test, however each may be defined in such Underlying Master Agreement, or any similar provision relating to a Party's or its Guarantor's financial condition (any such event, a

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

"Credit Event") is hereby deleted in its entirety from such Underlying Master Agreement so that the only rights and remedies upon the occurrence of a Credit Event shall be those set forth in this Agreement; provided, however, that, the foregoing shall not affect any provision of any Underlying Master Agreement allowing a Party to request adequate assurance of the other Party's ability to perform its obligations under such Underlying Master Agreement so long as such request is not conditioned upon the occurrence of a Credit Event.

**14.    Interpretation.** The Parties intend that (a) this Agreement constitutes and be deemed to be a "master netting agreement" (or any substantially similar term) and that the Parties be deemed to be "master netting agreement participants" (or any substantially similar term) within the meaning of, and as such terms are used in, any law, rule, regulation, statute, or order applicable to the Parties' rights herein, whether now or hereafter enacted or made applicable, including, but not limited to, the Code at 11 U.S.C. §§ 101(25), 101(47), 101(53B), 741(7) and 761(4); and (b) the MNA Final Settlement Amount, as well as all other netting, liquidation, and setoffs effectuated pursuant to this Agreement or any Underlying Master Agreement, be governed by the following Code sections in the event of the bankruptcy of either Party: (i) Sections 555, 556, 559 and 560; (ii) Section 362(b)(6), (7) and/or (17); (iii) Sections 546(e)-(g); and (iv) Section 548(d)(2). The Parties also agree that such setoffs, netting and liquidation contemplated hereunder or under any Underlying Master Agreement arise under swap agreements, securities contracts, repurchase agreements, forward contracts and/or commodity contracts (as applicable) and constitute "settlement payments" as set forth in Sections 101 and 741 of the Code. The Parties further agree that each payment or transfer of Performance Assurance under this Agreement or under any Underlying Master Agreement is either a "margin payment," a "settlement payment" or a "transfer" within the meaning of Sections 101(38), 101(51A) and 101(54), respectively, for purposes of, and as such terms are used in, the Code. The Parties further intend that this Agreement, the Underlying Master Agreements, all Confirmations, all Transactions, and any Guarantees provided in respect thereof, each and together constitute an "eligible financial contract" under and in all proceedings related to the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c.B-3 (Canada), the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, or the *Winding-Up and Restructuring Act*, R.S.C. 1985, c.W-11, as the same may be amended, restated, replaced, or re-enacted from time to time. The Parties further intend that the Underlying Master Agreements and each Transaction thereunder constitute "forward contracts", "commodity contracts", "securities contracts", "repurchase agreements" or "swap agreements" (as applicable), as such terms are defined in the Code. Moreover, with respect to any Underlying Master Agreement and any Transactions thereunder that constitute: (i) a "forward contract", each Party thereto constitutes a "forward contract merchant"; (ii) a "commodity contract", each Party thereto constitutes a "commodity broker"; (iii) a "swap agreement", each Party thereto constitutes a "swap participant"; (iv) a "securities contract", each Party thereto constitutes a "stockbroker", "financial institution" or "securities clearing agency"; and (v) a "repurchase agreement", each Party thereto constitutes a "repo participant", within the meaning of, and as such terms are used in the Code and/or any law, rule, regulation,

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

statute, or order applicable to the Parties' rights herein, whether now or hereafter enacted or made applicable.

**15.    Headings.** The use of headings and subheadings in this Agreement, and the division of this Agreement into sections and sub-sections, are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

**16.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO ITS CHOICE OF LAW DOCTRINES OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW OR THE PRINCIPLES OF CONFLICT OF LAW).**

**17.    Waiver of Immunities**. With respect to any claim under or relating to this Agreement, any Underlying Master Agreement, any Confirmation, or any Transaction thereunder, each Party hereby waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (a) suit, (b) jurisdiction of any court, (c) relief by way of injunction or order for specific performance or for recovery of property, (d) attachment of its assets (whether before or after judgment), and (e) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings.

**18.    Assignment**.

(a)    The provisions of this Section 18 shall supercede and replace in their entirety all provisions contained in any Underlying Master Agreements relating to assignment or transfer of rights or delegation of duties. Any purported assignment or other transfer that is not expressly permitted by this Agreement is void and unenforceable.

(b)    This Agreement, the Underlying Master Agreements, the Confirmations, and the Transactions, and any rights to amounts payable to a Party thereunder, shall not be assigned or otherwise transferred by either Party without the prior written consent of the other Party, which consent may not be unreasonably withheld, except (i) as collateral security or in connection with a monetization of such amounts payable, but only if the assignment or other transfer is made without relieving the assigning Party from liability thereunder and under this Agreement and (ii) pursuant to a consolidation or amalgamation with, or merger with or into, or, if Transfer of Assets (Party) Option is selected, transfer of all or substantially all of its assets to another entity (but without prejudice to any other right or remedy under this Agreement), provided that, in each case, such transfer or assignment is expressly subject and subordinate to this Agreement, any security interest granted herein, if any, and the rights of netting and setoff set forth herein.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

The assigning Party shall notify the other Party promptly of any assignment made in accordance with this Section.

(c)     Notwithstanding the foregoing, the Non-Defaulting Party may assign all or any part of its interest in the MNA Final Settlement Amount payable to it from the Defaulting Party pursuant to Section 5 of this Agreement.

**19.     Amendment.** Notwithstanding any provision in any Underlying Master Agreement to the contrary, neither this Agreement, nor any Underlying Master Agreement, may be amended with respect to any provisions set forth herein except by a written amendment signed by each Party.

**20.     Notices.** For purposes of this Agreement, the provisions of this Section 20, except as otherwise specifically provided herein, shall govern (and be deemed to satisfy the requirements of) all provisions of the Underlying Master Agreements relating to the delivery of notices thereunder and the effectiveness thereof other than notice provisions relating to (a) the logistics of the scheduling of, and other similar matters relating to, the physical delivery of commodities, (b) monthly invoices and payments applicable to the Underlying Master Agreements, and (c) exercise of any options under any Underlying Master Agreement. In the event a Party exercises specific rights set forth in an Underlying Master Agreement that do not trigger the application of this Agreement, the provisions in the notice section of the specific Underlying Master Agreement shall control the delivery of notices thereunder and the effectiveness thereof. All other notices, requests, statements or payments shall be made as specified in the Cover Sheet. Notices shall, unless otherwise specified herein, be in writing and may be delivered by hand delivery, United States mail, reputable overnight courier service or confirmed facsimile transmission. Notice by facsimile or hand delivery shall be effective on the day actually received, if received by 5:00 p.m., New York City time, on a Business Day, and otherwise shall be effective on the next Business Day. Notice sent by overnight United States mail or courier shall be effective on the next Business Day after it was sent. A Party may change its addresses by providing notice of the change in accordance herewith.

**21.     Conflicts and Inconsistencies.** In the event of any conflict or inconsistency between any provision of this Agreement and any provision of any Underlying Master Agreement or Confirmation concerning the matters set forth in this Agreement, the provisions of this Agreement shall govern. Parties may agree to terms in a particular Confirmation that are inconsistent with terms herein and, in such event, the terms of such Confirmation shall control for purposes of the applicable Transaction.

*If the CONFIDENTIALITY OPTION is selected on the Cover Sheet, the following Section 22 shall apply:*

**22.     Confidentiality.** The contents of this Agreement, the Underlying Master Agreements, the Confirmations, and all Transactions thereunder, all other documents relating thereto and any information pertaining thereto made available by either Party or its Guarantor(s) to the other Party or its Guarantor(s) is confidential and shall not be

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

disclosed to any third party, except for such information (a) as is or may become generally available to the public, (b) as may be required in response to any regulatory authority or any lawful summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard, (c) as may be obtained from a non-confidential source that disclosed such information in a manner that did not, to such Party's knowledge, violate its obligations to the non-disclosing Party or its Guarantor(s) in making such disclosure, or (d) as may be furnished to the disclosing Party's Affiliates, and to each of such Person's auditors, attorneys, advisors, lenders, or prospective purchasers which are required to keep the information that is disclosed in confidence or that is disclosed in connection with communications between the Parties under the terms of Section 18.

### 23.   **Continuation of Master Agreements; Severability.**

(a)    Each Party agrees that the Underlying Master Agreements are hereby amended as set forth in this Agreement. Except as amended by this Agreement (or as otherwise amended from time to time by written agreement between the Parties thereto), the Underlying Master Agreements and all Transactions shall remain in full force and effect, integrated into a single agreement as set forth in Section 1 of this Agreement.

(b)    Subject to Section 23(c), in the event any one or more of the provisions contained in this Agreement should be held invalid, illegal, or unenforceable in any respect under the law of any jurisdiction, the validity, legality, and enforceability of the remaining provisions under the law of such jurisdiction, and the validity, legality, and enforceability of such provisions and any other provisions under the law of any other jurisdiction, shall not in any way be affected or impaired thereby.

(c)    The Parties intend that this Agreement be construed to give full effect to the intent of the Parties with respect to the netting and setoff provisions contained herein. If the netting of Exposures and setoff of UMA Settlement Amounts (if applicable) contemplated herein and in the Collateral Annex shall be in any material respect deemed or held to be invalid, illegal, or unenforceable, all other provisions of this Agreement shall survive, except that the Performance Assurance held by the Receiving Party shall be allocated among the Underlying Master Agreements and/or Transactions to secure the Transferring Party's Obligations thereunder as determined in a commercially reasonable manner by the Receiving Party. The exposure thresholds and collateral requirements set forth in the Underlying Master Agreements shall be reinstated and thereafter be effective between the Parties to each such Underlying Master Agreement as therein stated. Within a reasonable time, but no later than 30 Business Days thereafter, the Receiving Party shall provide notice to the Transferring Party setting forth the allocation of the Performance Assurance held by the Receiving Party or posted for its benefit to each Underlying Master Agreement, which allocation may be determined in the sole discretion of the Receiving Party; provided, however, that if an MNA Default shall occur under any Underlying Master Agreement prior to such notice, the Non-defaulting Party shall have the right to apply Performance Assurance to satisfy the Obligations of the Defaulting Party under any such Underlying Master Agreement in accordance therewith. Thereafter,

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

the Non-defaulting Party shall be entitled to exercise its rights and remedies with respect to such Performance Assurance against the Obligations of the Defaulting Party under the applicable Underlying Master Agreement in accordance with such Underlying Master Agreement and/or Transaction.   Additionally, collateral thresholds under each Underlying Master Agreement shall be enforceable as if not amended or superceded hereby, and if an Underlying Master Agreement has no stated collateral threshold, the collateral threshold applicable to such Underlying Master Agreement shall be zero. To the extent that insufficient collateral is then possessed by either Party to secure the Obligations of the other Party, the Parties' obligations to transfer additional collateral shall be as set forth in the Underlying Master Agreements and/or Transactions. Each Party confirms and ratifies its grant of the security interest in Paragraph 2 of the Collateral Annex covering the Performance Assurance, as the same may be allocated among the Underlying Master Agreements in accordance herewith.

**24.** **No Waiver**. A failure or delay in exercising any right, power, or privilege in respect of any Underlying Master Agreement or this Agreement will not be presumed to operate as a waiver of that right, power, or privilege, and a single or partial exercise of any right, power, or privilege will not be presumed to preclude any subsequent or further exercise of that right, power, or privilege, or the exercise of any other right, power, or privilege.

**25.** **Jurisdiction and Venue; Waiver of Jury Trial.**

**NOTWITHSTANDING ANY PROVISION IN ANY OF THE UNDERLYING MASTER AGREEMENTS, WITH RESPECT TO ANY SUIT, ACTION, OR PROCEEDING, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE UNDERLYING MASTER AGREEMENTS, INCLUDING, THE CONFIRMATIONS OR THE TRANSACTIONS THEREUNDER, OR IN ANY WAY RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, INVOLVING THE PARTIES AND/OR THEIR RESPECTIVE REPRESENTATIVES, EACH PARTY AGREES TO SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL DISTRICT COURTS OF NEW YORK, LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, AND WAIVES ANY OBJECTION TO THE LAYING OF VENUE IN NEW YORK CITY. EACH PARTY FURTHER WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY SUCH SUIT, ACTION OR PROCEEDING.**

**26.** **Term.** This Agreement shall continue in effect from the Effective Date until terminated by agreement of the Parties.

**27.** **Expenses**. The Defaulting Party will, on demand, indemnify and hold harmless the Non-defaulting Party from and against all reasonable out-of-pocket expenses, including reasonable legal fees, consulting fees, and taxes, incurred by the

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Non-defaulting Party by reason of the enforcement and protection of its rights under this Agreement including, without limitation, costs of collection.

**28.    Waiver of Damages.    A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY; SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY HEREUNDER AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  NO PARTY SHALL BE LIABLE OR HAVE ANY RESPONSIBILITY TO THE OTHER PARTY OR TO SUCH OTHER PARTY'S AFFILIATES FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES WHATSOEVER, INCLUDING LOST EARNINGS OR LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE.  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE OR PASSIVE.  THE FOREGOING SHALL NOT LIMIT A PARTY'S RIGHT (A) PURSUANT TO AN UNDERLYING MASTER AGREEMENT TO INDEMNIFICATION IN RESPECT OF THIRD-PARTY CLAIMS, OR (B) REGARDLESS OF METHODOLOGY, TO DETERMINE ANY SETTLEMENT AMOUNT(S), UMA FINAL SETTLEMENT AMOUNT(S) OR MNA FINAL SETTLEMENT AMOUNT BY REFERENCE TO THE CONTRACT PRICE(S) OF THE RELEVANT PRODUCT(S), COMMODITY(IES) OR SERVICE(S).**

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

# COLLATERAL ANNEX
## to the
# MASTER NETTING, SETOFF, SECURITY, AND COLLATERAL AGREEMENT

## <u>CREDIT ELECTIONS COVER SHEET</u>

### Paragraph 10.    <u>Elections and Variables</u>

**I. Definitions**

          <u>Specified Letter of Credit Issuer</u>:    Party A _____ N/A _____
                                               Party B _____ N/A _____

      "<u>Material Adverse Change</u>" means,

            ☐      with respect to Party A, if the Credit Rating with respect to Party A's Guarantor falls below BBB from S&P or Baa2 from Moody's; and with respect to Party B, if the Credit Rating with respect to the Party B Designate falls below BBB from S&P or Baa2 from Moody's.

            ☐      with respect to Party A, if the Credit Rating with respect to [_____][Party A's Guarantor] falls below _____ from S&P and _____ from Moody's; and with respect to Party B, if the Credit Rating with respect to [_____][Party B's Guarantor] falls below _____ from S&P and _____ from Moody's.

            ☐      with respect to Party A, if [_____][Party A's Guarantor's] ACRV (as defined below) is greater than 10; and with respect to Party B, if [_____][Party B's Guarantor's] ACRV is greater than 10.

            ☒      Other –

                    with respect to Party A, if the Financial Covenant Ratios as defined in Section 7 of the Credit Agreement dated as of October 9, 2003 by and between SemGroup, L.P. and Bank of America are not maintained; and

                    with respect to Party B, if the Credit Rating with respect to Party B's Guarantor falls below BBB- from S&P or Baa3 from Moody's.

**II. Collateral Threshold**

      <u>**A. Party A Collateral Threshold.**</u>

            ☐      **(a)** The amount set forth below under the heading "Party A Collateral Threshold" opposite the Credit Rating for Party A's Guarantor on the relevant

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

date of determination, or (b) zero if on the relevant date of determination Party A's Guarantor does not have a Credit Rating from the rating agency specified below.

| **Party A CollateralThreshold** | **S&PCredit Rating** |
|---|---|
| | |

☐ (a) The amount set forth below under the heading "Party A Collateral Threshold" opposite the Credit Rating for Party A's Guarantor on the relevant date of determination, and if Party A's Guarantor's Credit Ratings shall not be equivalent, the lower Credit Rating shall govern or (b) zero if on the relevant date of determination its Guarantor does not have a Credit Rating from the rating agency(ies) specified below.

| **Party A CollateralThreshold** | **S&P Credit Rating** | **Moody's Credit Rating** |
|---|---|---|
| | | |

☐ The amount set forth below under the heading "Party A Collateral Threshold" opposite the ACRV for [Party A][Party A's Guarantor] on the relevant date of determination.

"ACRV" means, with respect to any person, the average of the Numerical Values applicable to the Credit Ratings (if any) published for such person by any of S&P, Moody's, and Fitch, as determined in accordance with the matrix below. In determining the ACRV, the average of the Numerical Values shall be rounded as follows: if the first decimal number is five (5) or below, the ACRV shall be rounded to the next lowest integer, and if the first decimal number is six (6) or above, the ACRV shall be rounded up to the next highest integer.

| **Party A Collateral Threshold** | **S&P Credit Rating** | **Moody's Credit Rating** | **Fitch Credit Rating** | **Numerical Value/ACRV** |
|---|---|---|---|---|
| $_____ | AAA | Aaa | AAA | 1 |
| $_____ | AA+ | Aa1 | AA+ | 2 |
| $_____ | AA | Aa2 | AA | 3 |
| $_____ | AA- | Aa3 | AA- | 4 |
| $_____ | A+ | A1 | A+ | 5 |
| $_____ | A | A2 | A | 6 |
| $_____ | A- | A3 | A- | 7 |
| $_____ | BBB+ | Baa1 | BBB+ | 8 |

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

| $_____ | BBB | Baa2 | BBB | 9 |
|---|---|---|---|---|
| $_____ | BBB- | Baa3 | BBB1 | 10 |
| $_____ | BB+ | Ba1 | BB+ | 11 |
| $_____ | BB | Ba2 | BB | 12 |
| $_____ | BB- | Ba3 | BB- | 13 |
| $_____ | B+ | B1 | B+ | 14 |
| $_____ | B | B2 | B | 15 |
| $_____ | B- | B3 | B- | 16 |

If either S&P or Moody's withdraws a Credit Rating assigned to a Person (without assigning a new Credit Rating), 16 shall be used as the Numerical Value from such rating agency for purposes of calculating the ACRV for such person. If Fitch withdraws a Credit Rating published with respect to a person, the ACRV shall be calculated as if Fitch had never provided a Credit Rating with respect to such person.

☐ The maximum amount payable pursuant to the Guaranty Agreement dated _____ from _____, as amended from time to time but in no event shall Party A's Collateral Threshold be greater than $_____.

☒ Other: $55,000,000.

## B.   Party B Collateral Threshold.

☒ (a) The amount set forth below under the heading "Party B Collateral Threshold" opposite the Credit Rating for the Party B Designate on the relevant date of determination, or (b) zero if on the relevant date of determination the Party B Designate does not have a Credit Rating from the rating agency specified below.

| Party B Collateral Threshold | | S&P Credit Rating |
|---|---|---|
| AA- or above | Aa3 or above | $300,000,000 |
| A- to A+ | A3 to A1 | $200,000,000 |
| BBB- to BBB+ | Baa3 to Baa1 | $100,000,000 |
| BB to BB+ | Ba2 to Ba1 | $ 25,000,000 |
| B+ to BB- | B1 to Ba3 | $ 10,000,000 |

☐ (a) The amount set forth below under the heading "Party B Collateral Threshold" opposite the Credit Rating for the Party B Designate on the relevant date of determination, and if the Party B Designate's Credit Ratings shall not be equivalent, the lower Credit Rating shall govern, or (b) zero if on the relevant date of determination Party B Designate does not have a Credit Rating from the relevant rating agency(ies) specified below.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

| Party B**Collateral Threshold** | **S&P Credit Rating** | **Moody's Credit Rating** |
|---|---|---|

☐ The amount set forth below under the heading "Party B Collateral Threshold" opposite the ACRV for [Party B][Party B's Guarantor] on the relevant date of determination.

"ACRV" means, with respect to any person, the average of the Numerical Values applicable to the Credit Ratings (if any) published for such person by any of S&P, Moody's, and Fitch, as determined in accordance with the matrix below. In determining the ACRV, the average of the Numerical Values shall be rounded as follows: if the first decimal number is five (5) or below, the ACRV shall be rounded to the next lowest integer, and if the first decimal number is six (6) or above, the ACRV shall be rounded up to the next highest integer.

| **Party B Collateral Threshold** | **S&P Credit Rating** | **Moody's Credit Rating** | **Fitch Credit Rating** | **Numerical Value/ACRV** |
|---|---|---|---|---|
| $_____ | AAA | Aaa | AAA | 1 |
| $_____ | AA+ | Aa1 | AA+ | 2 |
| $_____ | AA | Aa2 | AA | 3 |
| $_____ | AA- | Aa3 | AA- | 4 |
| $_____ | A+ | A1 | A+ | 5 |
| $_____ | A | A2 | A | 6 |
| $_____ | A- | A3 | A- | 7 |
| $_____ | BBB+ | Baa1 | BBB+ | 8 |
| $_____ | BBB | Baa2 | BBB | 9 |
| $_____ | BBB- | Baa3 | BBB1 | 10 |
| $_____ | BB+ | Ba1 | BB+ | 11 |
| $_____ | BB | Ba2 | BB | 12 |
| $_____ | BB- | Ba3 | BB- | 13 |
| $_____ | B+ | B1 | B+ | 14 |
| $_____ | B | B2 | B | 15 |
| $_____ | B- | B3 | B- | 16 |

If either S&P or Moody's withdraws a Credit Rating assigned to a Person (without assigning a new Credit Rating), 16 shall be used as the Numerical Value from such rating agency for purposes of calculating the ACRV for such person. If Fitch withdraws a Credit Rating published with respect to a person, the ACRV shall be calculated as if Fitch had never provided a Credit Rating with respect to such person.

☐ The maximum amount payable pursuant to the Guaranty Agreement dated _____ from _____, as amended from time to time but in no event shall Party B's Collateral Threshold be greater than $_____.

☐ Other -

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

**III. Eligible Collateral and Collateral Value**

The following items will qualify as "Eligible Collateral" for the Party specified:

| | | Party A | Party B | Collateral Value |
|---|---|---|---|---|
| (A) | Cash | [ X ] | [ X ] | 100% |
| (B) | Letters of Credit | [ X ] | [ X ] | 100% unless either (i) a Letter of Credit Default shall have occurred and be continuing with respect to such Letter of Credit, or (ii) twenty (20) or fewer Business Days remain prior to the expiration of such Letter of Credit, in which cases the Collateral Value shall be zero (0). |
| (C) | Other | [ ] | [ ] | _____% |

**IV.    Independent Amount.**

**A. Party A Independent Amount.**

☐    Party A Independent Amount.

☐    Party A shall have a Fixed Independent Amount of $_____.  If the Fixed Independent Amount option is selected for Party A, then Party A (which shall be a Pledging Party with respect to the Party A Fixed IA Performance Assurance) will be required to Transfer or cause to be Transferred to Party B (which shall be a Secured Party with respect to the Party A Fixed IA Performance Assurance) Eligible Collateral with a Collateral Value equal to the amount of such Fixed Independent Amount (the "Party A Fixed IA Performance Assurance").  The Party A Fixed IA Performance Assurance shall not be reduced for so long as there are any outstanding Obligations between the Parties, and shall not be taken into account when calculating Party A's Collateral Requirement pursuant to the Collateral Annex.  Except as expressly set forth above, the Party A Fixed IA Performance Assurance shall be held and maintained in accordance with, and otherwise be subject to, Paragraphs 2, 5(b), 5(c), 6, 7 and 9 of the Collateral Annex.

☐    Party A shall have a Full Floating Independent Amount of $_____.  If the Full Floating Independent Amount option is selected for Party A, then for purposes of calculating Party A's Collateral Requirement pursuant to Paragraph 3 of the Collateral Annex, such Full Floating Independent Amount for Party A shall be added by Party B to its Exposure Amount for purposes of determining Net Exposure pursuant to Paragraph 3(a) of the Collateral Annex.

☐    Party A shall have a Partial Floating Independent Amount of $_____.  If the Partial Floating Independent Amount option is selected for Party A, then Party A will be required to Transfer or cause to be Transferred to Party B Eligible Collateral with a Collateral Value equal to the amount of such Independent Amount (the "Party A Partial Floating IA Performance Assurance") if at any time Party A otherwise has a Collateral Requirement (not taking into

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

consideration the Partial Floating Independent Amount) pursuant to Paragraph 3 of the Collateral Annex.  The Party A Partial Floating IA Performance Assurance shall not be reduced so long as Party A has a Collateral Requirement (not taking into consideration the Partial Floating Independent Amount).  The Partial Floating Independent Amount shall not be taken into account when calculating Party A's Collateral Requirements pursuant to the Collateral Annex.  Except as expressly set forth above, the Party A Partial Floating IA Performance Assurance shall be held and maintained in accordance with, and otherwise be subject to, the Collateral Annex.

**B.**     **Party B Independent Amount.**

❑     Party B shall have a Fixed Independent Amount of $_____.  If the Fixed Independent Amount option is selected for Party B, then Party B (which shall be a Pledging Party with respect to the Party B Fixed IA Performance Assurance) will be required to Transfer or cause to be Transferred to Party A (which shall be a Secured Party with respect to the Party B Fixed IA Performance Assurance) Eligible Collateral with a Collateral Value equal to the amount of such Independent Amount (the "Party B Fixed IA Performance Assurance").  The Party B Fixed IA Performance Assurance shall not be reduced for so long as there are any outstanding Obligations between the Parties, and shall not be taken into account when calculating Party B's Collateral Requirement pursuant to the Collateral Annex.  Except as expressly set forth above, the Party B Fixed IA Performance Assurance shall be held and maintained in accordance with, and otherwise be subject to, Paragraphs 2, 5(b), 5(c), 6, 7 and 9 the Collateral Annex.

❑     Party B shall have a Full Floating Independent Amount of $_____.
If the Full Floating Independent Amount option is selected for Party B, then for purposes of calculating Party B's Collateral Requirement pursuant to Paragraph 3 of the Collateral Annex, such Full Floating Independent Amount for Party B shall be added by Party A to its Exposure Amount for purposes of determining Net Exposure pursuant to Paragraph 3(a) of the Collateral Annex.

❑     Party B shall have a Partial Floating Independent Amount of $_____.
If the Partial Floating Independent Amount option is selected for Party B, then Party B will be required to Transfer or cause to be Transferred to Party A Eligible Collateral with a Collateral Value equal to the amount of such Independent Amount (the "Party B Partial Floating IA Performance Assurance") if at any time Party B otherwise has a Collateral Requirement (not taking into consideration the Partial Floating Independent Amount) pursuant to Paragraph 3 of the Collateral Annex.  The Party B Partial Floating IA Performance Assurance shall not be reduced for so long as Party B has a Collateral Requirement (not taking into consideration the Partial Floating Independent Amount).  The Partial Floating Independent Amount shall not be taken into account when calculating Party B's Collateral Requirements pursuant to the Collateral Annex.  Except as expressly set forth above, the Party B Partial Floating IA Performance Assurance shall be held and maintained in accordance with, and otherwise be subject to, the Collateral Annex.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

## V.    Minimum Transfer Amount.

    **A.**    **Party A Minimum Transfer Amount:**    $250,000

    **B.**    **Party B Minimum Transfer Amount:**    $250,000

## VI.    Rounding Amount.

    **A.**    **Party A Rounding Amount:**    $10,000

    **B.**    **Party B Rounding Amount:**    $10,000

## VII.    Administration of Cash Collateral.

    **A.**    **Party A Eligibility to Hold Cash.**

      ☒    Party A shall not be entitled to hold Performance Assurance Transferred to it in the form of Cash. Performance Assurance Transferred to Party A in the form of Cash shall be held in a Qualified Institution in accordance with the provisions of Paragraph 6(a)(ii)(B) of the Collateral Annex. Party A shall pay to Party B in accordance with the terms of the Collateral Annex the Interest Amount with respect to any Performance Assurance in the form of Cash posted by Party B.

      ☐    Party A shall be entitled to hold Performance Assurance Transferred to it in the form of Cash provided that the following conditions are satisfied: (1) it is not a Defaulting Party, (2) Cash shall be held only in any jurisdiction within the United States, (3) no Material Adverse Change has occurred or is continuing with respect to Party A, and (4) Party A's Guarantor has a Credit Rating from S&P and the lowest Credit Rating for Party A's Guarantor is BBB or higher from S&P and Party A's Guarantor has a Credit Rating from Moody's and the lowest Credit Rating for Party A's Guarantor is Baa2 or higher from Moody's.

      To the extent Party A is entitled to hold Cash, the Interest Rate payable to Party B on Cash shall be as selected below:

        **Party A Interest Rate.**

          ☒    With respect to Cash held by a party, the Interest Rate will be at a rate per the **Prime Rate** for Large Banks (the base rate on corporate loans posted by at least 75% of the nation's 30 largest Banks) as reported in the **Wall Street Journal** minus 3% but in no event shall the Interest rate be less than Zero percent.

          ☒    Other: With respect to Cash held by a Qualified Institution on behalf of Party A, the definition of "Interest Amount" shall mean the earnings, if any, on such Cash in the Collateral Account.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

**B.** **Party B Eligibility to Hold Cash.**

☐ Party B shall not be entitled to hold Performance Assurance Transferred to it in the form of Cash.  Performance Assurance Transferred to Party B in the form of Cash shall be held in a Qualified Institution in accordance with the provisions of Paragraph 6(a)(ii)(B) of the Collateral Annex.  Party B shall pay to Party A in accordance with the terms of the Collateral Annex the Interest Amount with respect to any Performance Assurance in the form of Cash posted by Party A.

☒ Party B shall be entitled to hold Performance Assurance Transferred to it in the form of Cash provided that the following conditions are satisfied:  (1) it is not a Defaulting Party, (2) Cash shall be held only in any jurisdiction within the United States, (3) no Material Adverse Change has occurred or is continuing with respect to Party B, and (4) the Party B Designate has a Credit Rating from S&P and the lowest Credit Rating for the Party B Designate is BBB or higher from S&P and Party B Designate has a Credit Rating from Moody's and the lowest Credit Rating for Party B Designate is Baa2 or higher from Moody's .

To the extent Party B is entitled to hold Cash, the Interest Rate payable to Party A on Cash shall be as selected below:

### Party B Interest Rate.

☒ With respect to Cash held by a party, the Interest Rate will be at a rate per the **Prime Rate** for Large Banks (the base rate on corporate loans posted by at least 75% of the nation's 30 largest Banks) as reported in the **Wall Street Journal** minus 3% but in no event shall the Interest rate be less than Zero percent.

☒ Other:  With respect to Cash held by a Qualified Institution on behalf of Party B, the definition of "Interest Amount" shall mean the earnings, if any, on such Cash in the Collateral Account.

**VII.** **Notification Time.**

☐ Other - N/A

**VIII.** **General.**

With respect to the Collateral Threshold, Independent Amount, Minimum Transfer Amount and Rounding Amount, if no selection is made in this Cover Sheet with respect to a Party, then the applicable amount in each case for such Party shall be zero (0).  In addition, with respect to the "Administration of Cash Collateral" section of this Credit Elections Cover Sheet, if no selection is made with respect to a Party, then such Party shall not be entitled to hold Performance Assurance in the form of Cash and such Cash, if any, shall be held in a Qualified Institution pursuant to Paragraph 6(a)(ii)(B) of the Collateral Annex.  If a Party is eligible to hold Cash pursuant to a selection in this Credit Elections Cover Sheet but no Interest Rate is selected, then the Interest Rate for such Party shall be the Federal Funds Effective Rate as defined in Section VI of this Credit Elections Cover Sheet.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

**IX.**    **Other.**

(4)    Insert the following at the end of Exhibit A before "[BANK SIGNATURE]":

Partial and multiple drawings are permitted hereunder.

Terms defined in the Master Agreement shall have the same meanings when used in this Letter of Credit.

If monies duly paid by us under this Letter of Credit are not immediately applied against amounts that are due and payable by the Account Party under the Master Agreement, but are instead retained by you as collateral in accordance with the Master Agreement, such monies shall be segregated from any other Performance Assurance transferred by the Account Party or by any other party for the Obligations of the Account Party, and any amounts required to be returned to Account Party involving such monies that arise on any subsequent Calculation Date shall be promptly repaid by you to us.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

## COLLATERAL ANNEX TO

## MASTER NETTING, SETOFF,

## SECURITY, AND COLLATERAL AGREEMENT

This Collateral Annex, together with the attached Credit Elections Cover Sheet (as defined below), and any exhibits, schedules and supplements hereto (collectively, the "Collateral Annex"), supplements, forms a part of, and is subject to, the Master Netting, Setoff, Security, and Collateral Agreement (the "Master Agreement" and together with the Cover Sheet, the Collateral Annex, the Credit Elections Cover Sheet and any exhibits, schedules and supplements hereto and thereto, the "Agreement"). Capitalized terms used in this Collateral Annex but not defined herein shall have the meanings given such terms in the Agreement.

The Obligations of each Party under the Agreement shall be secured in accordance with the provisions of this Collateral Annex, which sets forth the conditions under which a Party, in connection with any Underlying Master Agreement, will be required to Transfer Performance Assurance as well as the conditions under which a Party will release such Performance Assurance.

Paragraph 1.   Definitions.

For purposes of this Collateral Annex, the following terms have the respective definitions set forth below:

"Agreement" has the meaning attributed to it in the first paragraph of this Collateral Annex.

"Calculation Date" means any Local Business Day on which a Party elects or is requested by the other Party to make the determinations referred to in Paragraphs 3, 4, 5 or 8 of this Collateral Annex.

"Cash" means United States Dollars Transferred as Performance Assurance hereunder.

"Collateral Account" has the meaning attributed to it in Paragraph 6(a)(ii)(B).

"Collateral Annex" has the meaning attributed to it in the first paragraph of this Collateral Annex.

"Collateral Requirement" has the meaning attributed to it in Paragraph 3(b).

"Collateral Threshold" means, with respect to a Party, the collateral threshold, if any, set forth for such Party in the Credit Elections Cover Sheet; provided, however, that the Collateral Threshold for such Party shall be zero upon the occurrence and during the

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

continuance of an MNA Default, a Potential MNA Default, or a Material Adverse Change with respect to such Party.

"Collateral Value" means, on any Calculation Date, (a) with respect to Cash, the face amount thereof on that Calculation Date; (b) with respect to a Letter of Credit, the Valuation Percentage therefor multiplied by the stated amount then available to be drawn under the Letter of Credit by the beneficiary thereof on that Calculation Date; and (c) with respect to other forms of Performance Assurance, the Valuation Percentage therefor multiplied by the fair market value on that Calculation Date of each such item of Performance Assurance, as determined by the Secured Party in a commercially reasonable manner.

"Credit Elections Cover Sheet" means the Credit Elections Cover Sheet attached hereto and incorporated herein setting forth certain elections governing this Collateral Annex.

"Credit Rating" means, with respect to any Person, on any date of determination, the respective rating then assigned to such Person's unsecured, senior long-term debt or deposit obligations (not supported by third-party credit enhancement) by S&P, Moody's, or any other specified rating agency or agencies. If no rating is assigned to such Person's unsecured, senior long-term debt or deposit obligations by such agency, then "Credit Rating" shall mean the general corporate credit rating or long-term issuer rating, as applicable, assigned by such rating agency to such Person.

"Credit Rating Event" has the meaning attributed to it in Paragraph 6(a)(ii).

"Current Mark-to-Market Value" of any Transaction, on any Calculation Date, means the amount, as calculated in a commercially reasonable manner, which a Party would pay to (if the Current Mark-to-Market Value is negative) or receive from (if the Current Mark-to-Market Value is positive) the other Party as the Settlement Amount, exclusive of Costs (calculated at the mid-point between the bid price and the offer price) for such Transaction if such Transaction were being terminated on the relevant Calculation Date.

"Custodian" has the meaning attributed to it in Paragraph 6(a)(i).

"Downgraded Party" has the meaning attributed to it in Paragraph 6(a)(ii).

"Eligible Collateral" means, with respect to a Party, the forms of collateral and credit support specified as such for such Party on the Credit Elections Cover Sheet.

"Exposure" of one Party ("Party X") to the other Party ("Party Y") for any Transaction means, as of any Calculation Date, the sum, (without duplication), of the following:

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

(a)     the aggregate of all amounts in respect of such Transaction that are owed or otherwise accrued (regardless of whether such amounts have been or could be invoiced) to Party X and that remain unpaid as of such Calculation Date, minus the aggregate of all amounts in respect of such Transaction that are owed or otherwise accrued (regardless of whether such amounts have been or could be invoiced) to Party Y and that remain unpaid as of such Calculation Date; plus

(b)     the Current Mark-to-Market Value of such Transaction to Party X.

"Exposure Amount" has the meaning set forth in Paragraph 3(a).

"Fitch" means Fitch Investor Service, Inc. or its successor.

"Independent Amount" means, with respect to a Party, the amount, if any, set forth in the Credit Elections Cover Sheet for such Party (which amount, if designated, shall either be a Fixed Independent Amount, a Full Floating Independent Amount or a Partial Floating Independent Amount, in each case, as designated in the Credit Elections Cover Sheet), or if no such amount is specified in the Credit Elections Cover Sheet for such Party, zero, or with respect to either Party and any Transaction, an additional or reduced amount agreed to as such for that Party in respect of that Transaction.

"Interest Amount" means with respect to a Party and an Interest Period, the sum of the daily interest amounts for all days in such Interest Period; each daily interest amount to be determined by such Party as follows: (a) the amount of Cash held by such Party on that day; multiplied by (b) the Interest Rate for that day, divided by (c) 360.

"Interest Period" means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred by a Party (or if no Interest Amount has yet been Transferred by such Party, the Local Business Day on which Performance Assurance in the form of Cash was first Transferred to such Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

"Interest Rate" means, in respect of a Party holding Cash, the rate specified as the Interest Rate for such Party in the Credit Elections Cover Sheet.

"Letter of Credit" means an irrevocable, transferable, standby letter of credit, issued by (a) a major U.S. commercial bank or the U.S. branch office of a major foreign bank assigned, in either case, a Credit Rating of at least (i) "A-" by S&P and "A3" by Moody's, if such entity is rated by both S&P and Moody's or (ii) "A-" by S&P or "A3" by Moody's, if such entity is rated by either S&P or Moody's but not both, or (b) any other entity designated on the Credit Elections Cover Sheet as a Specified Letter of Credit Issuer, which letter of credit is substantially in the form set forth in Exhibit A attached hereto, with such changes to its terms as the issuer of the letter of credit may require and as may be reasonably acceptable to the beneficiary thereof.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

"Letter of Credit Default" means, with respect to a Letter of Credit, the occurrence of any of the following events: (a) the issuer of such Letter of Credit shall not have assigned to it a Credit Rating of at least (i) "A-" by S&P or "A3" by Moody's, if such issuer is rated by both S&P and Moody's, (ii) "A-" by S&P, if such issuer is rated only by S&P, or (iii) "A3" by Moody's, if such issuer is rated only by Moody's; (b) the issuer of the Letter of Credit shall fail to comply with or perform its obligations under such Letter of Credit as and when required; (c) the issuer of such Letter of Credit shall disaffirm, disclaim, repudiate, refuse, or reject, in whole or in part, or challenge the validity of, such Letter of Credit; (d) such Letter of Credit shall expire or terminate, or shall fail or cease to be in full force and effect at any time during the term of the Agreement, in any such case without replacement; or (e) the Bankruptcy of the issuer of such Letter of Credit; provided, however, that no Letter of Credit Default shall be deemed to have occurred or be continuing after the time such Letter of Credit is required to be canceled or returned to a Party in accordance with the terms of this Collateral Annex.

"Local Business Day" means a day on which commercial banks are open for business (a) in relation to any payment or Transfer, in the city where the relevant payee account or transferee, as the case may be, is located and (b) in relation to any notice or other communication, in the city specified in the address for notice provided by the intended recipient.

"Material Adverse Change", with respect to a Party, has the meaning specified on the Credit Elections Cover Sheet, or, if no meaning is specified, this term shall not apply to the Parties.

"Minimum Transfer Amount" means, with respect to a Party, the amount, if any, set forth in the Credit Elections Cover Sheet for such Party.

"Moody's" means Moody's Investors Service, Inc. or its successor.

"Net Exposure" has the meaning attributed to it in Paragraph 3(a).

"Notification Time" means 11:00 a.m., New York City time, on any Calculation Date or, if a different time is specified in the Credit Elections Cover Sheet, such different time.

"Performance Assurance" means (i) for purposes of Paragraphs 3, 4, 5 and 8 of this Collateral Annex, all Eligible Collateral, and all proceeds thereof, that has been Transferred to or received by a Party hereunder to secure payment or performance of the other Party's Obligations and not subsequently returned to the other Party in accordance with this Collateral Annex or the relevant Underlying Master Agreement, if applicable, and (ii) for all other purposes, all collateral described in clause (i) above and all other property acceptable to the Party to which it is Transferred, and all proceeds thereof, that has been Transferred to or received by a Party hereunder and not subsequently Transferred to the other Party or otherwise received by or returned to the other Party. Any interest or other amount earned by virtue of the permitted investment of Cash

Transferred to and held by a Party as Performance Assurance, and any Cash received and held by a Party after drawing on any Letter of Credit Transferred to it as Performance Assurance, will constitute Performance Assurance in the form of Cash.  Any guaranty agreement executed by a Guarantor of a Party shall not constitute Performance Assurance hereunder.

"Pledging Party" has the meaning attributed to it in Paragraph 3(b).

"Qualified Institution" means a commercial bank or trust company organized under the laws of the United States or a political subdivision thereof, (i) that has a Credit Rating of at least (a) "A-" by S&P and "A3" by Moody's, if such entity is rated by both S&P and Moody's or (b) "A-" by S&P or "A3" by Moody's, if such entity is rated by either S&P or Moody's but not both, and (ii) having a capital and surplus of at least $1,000,000,000.

"Rounding Amount" means, with respect to a Party, the amount, if any, set forth in the Credit Elections Cover Sheet for such Party.

"S&P" means the Standard & Poor's Rating Group, a Division of The McGraw-Hill Companies, Inc., or its successor.

"Secured Party" has the meaning attributed to it in Paragraph 3(a).

"Specified Letter of Credit Issuer" means any entity specified as such on the Credit Elections Cover Sheet.

"Transfer" means, with respect to any Performance Assurance or Interest Amount, and in accordance with the instructions of the Party entitled thereto:

(a)    in the case of Cash, payment or transfer by wire transfer into one or more bank accounts specified by the recipient;

(b)    in the case of Letters of Credit, actual, physical delivery of the Letter of Credit or an amendment thereto, as the case may be, to the recipient; and

(c)    in the case of any other type of Performance Assurance, delivery thereof to the recipient as specified by the recipient.

"Valuation Percentage" means, with respect to any type of Performance Assurance designated as Eligible Collateral on the Credit Elections Cover Sheet, the Valuation Percentage specified for such type of Performance Assurance on the Credit Elections Cover Sheet.

Paragraph 2.    Encumbrance; Grant of Security Interest.

As security for the prompt and complete payment of all Obligations now due or that may hereafter become due from a Party to the other Party and performance by a

Party of all of its Obligations, each Party hereby pledges, assigns, conveys and transfers to the other Party, and hereby grants to the other Party a present and continuing security interest in and to, and a general first lien upon and right of set off against, all of such Party's right, title and interest in, to and under any Performance Assurance (other than Letters of Credit) which has been or may in the future be Transferred to, or received by, the other Party, and all dividends, interest, and other proceeds from time to time received, receivable, or otherwise distributed in respect of, or in exchange for, any or all of the foregoing.

Paragraph 3. Calculations of Collateral Requirement.

(a)    A Party's "Exposure Amount" on any Calculation Date shall be determined by calculating such Party's Exposure to the other Party in respect of each Transaction for which there is any Obligation remaining unpaid or unperformed and determining the net aggregate sum of all Exposures for all Transactions for such Party. The Party having the greater Exposure Amount on any Calculation Date (the "Secured Party") shall be deemed to have a "Net Exposure" to the other Party equal to the Secured Party's Exposure Amount.

(b)    The "Collateral Requirement" for a Party (the "Pledging Party") on any Calculation Date means the Secured Party's Net Exposure minus the sum of:

(1)    the Pledging Party's Collateral Threshold; plus

(2)    the Collateral Value of all Cash held by the Secured Party as Performance Assurance, and any accrued Interest Amount that has not yet been Transferred to the Pledging Party; plus

(3) the Collateral Value of each Letter of Credit and any other form of Performance Assurance (other than Cash) previously Transferred by the Pledging Party to the Secured Party that has not been returned to the Pledging Party;

provided, however, that, the Collateral Requirement of the Pledging Party will be deemed to be zero (0) whenever the calculation of such Pledging Party's Collateral Requirement yields a number less than zero (0).

Paragraph 4. Delivery of Performance Assurance.

On any Calculation Date on which (a) no MNA Default or Potential MNA Default with respect to the Secured Party has occurred and is continuing, (b) no UMA Default or Potential UMA Default with respect to the Secured Party has occurred and is continuing, (c) no early termination date has occurred or been designated under any Underlying Master Agreement by the Pledging Party for which there exist any unsatisfied payment Obligations owed by the Secured Party, and (d) the Pledging Party's Collateral Requirement equals or exceeds its Minimum Transfer Amount, the Secured Party may demand, by notice to the Pledging Party, that the Pledging Party Transfer to the Secured Party, and the Pledging Party shall Transfer or cause to be Transferred to the Secured Party, Performance Assurance for the benefit of the Secured Party having a Collateral

Value on the date of Transfer at least equal to the Pledging Party's Collateral Requirement. The amount of Performance Assurance required to be Transferred hereunder shall be rounded up to the nearest integral multiple of the Rounding Amount. Unless otherwise agreed in writing by the Parties, (i) Performance Assurance demanded of a Pledging Party on or before the Notification Time on a Local Business Day shall be provided to the Secured Party and/or its Custodian by 5:00 p.m. New York time on the next Local Business Day and (ii) Performance Assurance demanded of a Pledging Party after the Notification Time on a Local Business Day shall be provided to the Secured Party and/or its Custodian by 5:00 p.m. New York time on the second Local Business Day thereafter. Any Letter of Credit or other type of Performance Assurance (other than Cash) shall be Transferred to such address as the Secured Party shall specify in its demand pursuant to this Paragraph 4, and any such demand made by the Secured Party pursuant to this Paragraph 4 shall specify wire transfer information for the account(s) to which Performance Assurance in the form of Cash shall be Transferred. Notwithstanding anything to the contrary in this Collateral Annex, in the event an MNA Default, Potential MNA Default, UMA Default, Potential UMA Default or Material Adverse Change with respect to the Pledging Party gives rise to an obligation to Transfer Performance Assurance, the Pledging Party shall have no obligation to provide such Performance Assurance if such event is cured or otherwise no longer exists prior to the time that such Performance Assurance is required to be provided hereunder.

Paragraph 5. <u>Reduction and Substitution of Performance Assurance.</u>

(a)     On any Local Business Day (but no more frequently than weekly with respect to Letters of Credit and daily with respect to Cash), a Pledging Party may demand, by notice to the Secured Party, a reduction in the amount of Performance Assurance previously provided by the Pledging Party for the benefit of the Secured Party, and the Secured Party shall comply with said demand, <u>provided</u> that after giving effect to the demanded reduction in Performance Assurance, (i) the Pledging Party shall have a Collateral Requirement of zero as of the date of such compliance; (ii) no MNA Default or Potential MNA Default with respect to the Pledging Party has occurred and is continuing; (iii) no UMA Default or Potential UMA Default with respect to the Pledging Party has occurred and is continuing; and (iv) no early termination date has occurred or been designated under any Underlying Master Agreement by the Secured Party for which there exist any unsatisfied payment Obligations owed by the Pledging Party. The amount of the Performance Assurance reduction hereunder shall be rounded down to the nearest integral multiple of the Rounding Amount. A permitted reduction in Performance Assurance shall be effected by the Transfer of Cash to the Pledging Party or the reduction of the amount that may be drawn under an outstanding Letter of Credit previously issued for the benefit of the Secured Party, as specified by the Pledging Party. In all cases, the cost and expense of reducing Performance Assurance (including, but not limited to, the reasonable costs, expenses, and attorneys' fees of the Secured Party directly incurred in making the reduction) shall be borne by the Pledging Party. If a permitted reduction in Performance Assurance is to be effected by the Transfer of Cash to the Pledging Party, then unless otherwise agreed in writing by the Parties, (i) if the Pledging Party's reduction demand is made on or before the Notification Time on a Local Business Day,

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

then the Secured Party shall effect a permitted reduction in Performance Assurance by 5:00 p.m. New York time on the next Local Business Day thereafter and (ii) if the Pledging Party's reduction demand is made after the Notification Time on a Local Business Day, then the Secured Party shall effect a permitted reduction in Performance Assurance by 5:00 p.m. New York time on the second Local Business Day thereafter. If a permitted reduction in Performance Assurance is to be effected by a reduction in the amount that may be drawn under an outstanding Letter of Credit previously issued for the benefit of the Secured Party, the Secured Party shall promptly take such action as is reasonably necessary to cooperate with the Pledging Party to effectuate such reduction.

(b)    Except when (i) an MNA Default or Potential MNA Default with respect to the Pledging Party has occurred and is continuing, (ii) a UMA Default or Potential UMA Default with respect to the Pledging Party has occurred and is continuing, or (iii) an early termination date has occurred or been designated under any Underlying Master Agreement by the Secured Party for which there exist any unsatisfied payment Obligations owed by the Pledging Party, the Pledging Party may substitute new Performance Assurance for existing Performance Assurance of equal Collateral Value on the Local Business Day following the Secured Party's receipt of written notice thereof (provided that, if such notice is made after the Notification Time, the Pledging Party may not substitute Performance Assurance until the second Local Business Day thereafter; and provided further, however, that if such substitute Performance Assurance is of a type not designated as Eligible Collateral in the Credit Elections Cover Sheet, then the substitution may not occur unless the Secured Party consents to such substitution). Upon the Transfer to the Secured Party and/or its Custodian of the substitute Performance Assurance, the Secured Party and/or its Custodian shall Transfer the relevant replaced Performance Assurance to the Pledging Party by 5:00 p.m. New York time on the second Local Business Day after such Transfer has been effected.  Notwithstanding anything herein to the contrary, no such substitution shall be permitted unless (i) the substitute Performance Assurance is Transferred to the Secured Party and/or its Custodian simultaneously with, or has been Transferred to the Secured Party and/or its Custodian prior to, the release of the Performance Assurance to be returned to the Pledging Party and the security interest in, and lien upon, such substituted Performance Assurance granted pursuant hereto in favor of the Secured Party shall have been perfected as required by applicable law and shall constitute a first priority perfected security interest therein and general first lien thereon, and (ii) after giving effect to such substitution, the Collateral Value of such substitute Performance Assurance shall equal the Collateral Value of the Performance Assurance which is being substituted.  Each substitution of Performance Assurance shall constitute a representation, warranty and agreement by the Pledging Party that the substituted Performance Assurance shall be subject to and governed by the terms and conditions of this Collateral Annex, including without limitation, the security interest in, general first lien on and right of offset against, such substituted Performance Assurance granted pursuant to Paragraph 2 in favor of the Secured Party.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

(c)    The Transfer of any Performance Assurance by the Secured Party and/or its Custodian to the Pledging Party in accordance with this Paragraph 5 shall be deemed a release by the Secured Party of its security interest, general first lien and right of offset granted pursuant to Paragraph 2 hereof only with respect to such returned Performance Assurance.  In connection with each Transfer of any Performance Assurance to the Pledging Party pursuant to this Paragraph 5, the Pledging Party will, upon request of the Secured Party, execute a receipt showing the Performance Assurance Transferred to it.

Paragraph 6.  <u>Administration of Performance Assurance</u>.

(a)    <u>Cash</u>.  Performance Assurance provided in the form of Cash to a Party shall be subject to the following provisions.

(i)    <u>Holding of Cash</u>.  If such Party is entitled pursuant to the Credit Elections Cover Sheet to hold Cash, then it may either hold Cash or appoint an agent which is a Qualified Institution (a "<u>Custodian</u>") to hold Cash for it, <u>provided</u> that the conditions for holding Cash that are set forth on the Credit Elections Cover Sheet for such Party are and continue to be satisfied.  If such Party is not entitled pursuant to the Credit Elections Cover Sheet to hold Cash, then Cash shall be held in a Qualified Institution in accordance with the provisions of Paragraph 6(a)(ii)(B).  Upon notice from the Secured Party to the Pledging Party of the appointment of a Custodian and delivery of instructions for Transfers to such Custodian, the Pledging Party's subsequent obligations to make any Transfer will be discharged by making the Transfer to such Custodian in accordance with such instructions.  The holding of Cash by a Custodian will be deemed to be the holding of Cash by the Secured Party for which the Custodian is acting.  If the Secured Party fails to satisfy any conditions for holding Cash as set forth in the Credit Elections Cover Sheet or if the Secured Party's Custodian fails to be a Qualified Institution, then the Secured Party will Transfer, or cause its Custodian to Transfer, the Cash to a (or another, as applicable) Qualified Institution within three (3) Business Days of the event triggering its or its Custodian's inability to hold Cash and the Cash shall be maintained in accordance with Paragraph 6(a)(ii)(B).  Except as set forth in Paragraph 6(c), the Secured Party shall be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(ii)    <u>Use of Cash</u>.  Notwithstanding the provisions of applicable law, if (x) no MNA Default with respect to the Secured Party has occurred and is continuing; (y) no UMA Default with respect to the Secured Party has occurred and is continuing; and (z) no early termination date has occurred or been designated under any Underlying Master Agreement by the Pledging Party for which there exist any unsatisfied payment Obligations owed by the Secured Party, then the Secured Party shall have the right (such right being hereinafter referred to herein as the "<u>Use of Cash Right</u>") to sell, pledge, hypothecate, assign, invest, use, commingle, or otherwise use in its business any Cash that it holds as Performance Assurance hereunder, free from any claim or right of any nature whatsoever of the Pledging Party, including any equity or right of redemption by the Pledging Party; <u>provided</u>, <u>however</u>, that if and for so long as a Party or its Custodian is not eligible to hold Cash pursuant to Paragraph 6(a) (such Party, a "<u>Downgraded</u>

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

<u>Party</u>," and the event that caused such Party or its Custodian to be ineligible to hold Cash, a "<u>Credit Rating Event</u>"), then:

>    (A)    the Downgraded Party shall no longer have the Use of Cash Right; and

>    (B)    the Downgraded Party shall be required to Transfer (or cause to be Transferred) not later than the 5:00 p.m. New York time on the next Local Business Day following such Credit Rating Event all Cash in its possession or held on its behalf as Performance Assurance to a Qualified Institution, to be held in a segregated, safekeeping or custody account (the "<u>Collateral Account</u>") within such Qualified Institution with the title of the account indicating that the property contained therein is being held as Cash for the Downgraded Party. The cash in the Collateral Account may not be commingled with any other funds of the Downgraded Party, the Qualified Institution or any other Person, but must be kept segregated. The Qualified Institution shall serve as Custodian with respect to the Cash in the Collateral Account, and shall hold such Cash in accordance with the terms of this Collateral Annex and the security interest of the Downgraded Party and execute such account control and other agreements as are necessary or desirable to perfect the security interest of the Downgraded Party therein pursuant to the UCC or otherwise, and subject to such security interest, for the ownership and benefit of the non-Downgraded Party. The Qualified Institution holding the Cash will invest and reinvest or procure the investment and reinvestment of the Cash in accordance with the written instructions of the Pledging Party, subject to the approval of such instructions by the Downgraded Party (which approval shall not be unreasonably withheld), <u>provided</u> that the Qualified Institution shall not be required to so invest or reinvest or procure such investment or reinvestment if an MNA Default, a Potential MNA Default, a UMA Default or a Potential UMA Default with respect to the Pledging Party shall have occurred and be continuing or an early termination date has occurred or been designated under any Underlying Master Agreement by the Secured Party for which there exist any unsatisfied payment Obligations owed by the Pledging Party. The Downgraded Party shall have no responsibility for any losses resulting from any investment or reinvestment effected in accordance with the Pledging Party's instructions.

(iii)    <u>Interest Payments on Cash</u>. Except when (x) an MNA Default or Potential MNA Default with respect to the Pledging Party has occurred and is continuing, (y) a UMA Default or Potential UMA Default with respect to the Pledging Party has occurred and is continuing, or (z) an early termination date has occurred or been designated under any Underlying Master Agreement by the Secured Party for which there exist any unsatisfied payment Obligations owed by the Pledging Party, but only to the extent that an obligation of the Pledging Party to Transfer Performance Assurance would not be created or increased by the Transfer, in the event that the Secured Party or its Custodian is holding Cash, the Secured Party will Transfer (or caused to be Transferred) to the Pledging Party, in lieu of any interest or other amounts paid or deemed to have been paid

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

with respect to such Cash (all of which may be retained by the Secured Party or its Custodian), the Interest Amount. The Pledging Party shall invoice the Secured Party monthly setting forth the calculation of the Interest Amount due, and the Secured Party shall make payment thereof by the later of (A) the third Local Business Day of the first month after the last month to which such invoice relates or (B) the third Local Business Day after the day on which such invoice is received. Upon the occurrence and during the continuance of a Potential MNA Default, an MNA Default, a Potential UMA Default, or a UMA Default, in each case with respect to the Pledging Party, or the designation of an early termination date under any Underlying Master Agreement by the Secured Party for which there exist any unsatisfied payment Obligations owed by the Pledging Party, the Secured Party or its Custodian shall retain any such Interest Amount as additional Performance Assurance hereunder until (A) the MNA Default, Potential MNA Default, UMA Default or Potential UMA Default has been cured, or (B) the obligations of the Pledging Party under such Underlying Master Agreement have been satisfied in the case of an early termination date.

(b)     Letters of Credit. Performance Assurance provided in the form of a Letter of Credit shall be subject to the following provisions.

(i)     Each Letter of Credit shall be provided in accordance with Paragraph 4, and each Letter of Credit shall name the Secured Party as beneficiary thereof. The Pledging Party shall (A) renew or cause the renewal of each outstanding Letter of Credit on a timely basis as provided in the relevant Letter of Credit, to the extent that such renewal is required under this Collateral Annex, (B) if the issuer of an outstanding Letter of Credit has indicated its intent not to renew or shall not renew such Letter of Credit, provide either a substitute Letter of Credit or other Eligible Collateral, in each case at least twenty (20) Local Business Days prior to the expiration of the outstanding Letter of Credit, and (C) if the issuer of a Letter of Credit shall fail to honor the Secured Party's properly documented request to draw on an outstanding Letter of Credit, provide for the benefit of the Secured Party either a substitute Letter of Credit or other Eligible Collateral, in each case within one (1) Local Business Day after such failure, provided that, if the Pledging Party failed to comply with (A), (B), or (C) above, the Pledging Party's Collateral Requirement would be greater than zero. A Pledging Party's failure to provide either a substitute Letter of Credit or other Eligible Collateral in accordance with the foregoing shall constitute an MNA Default under Section 3(d)(viii) of the Master Agreement.

(ii)     As one method of providing Performance Assurance, the Pledging Party may increase the amount of an outstanding Letter of Credit through an amendment signed by the issuer and both Parties or establish one or more additional Letters of Credit.

(iii) Upon the occurrence of a Letter of Credit Default, the Pledging Party agrees to Transfer to the Secured Party either a substitute Letter of Credit or other Eligible Collateral, in each case on or before the first Local Business Day after the occurrence thereof (or the third (3rd) Local Business Day after the occurrence thereof if only clause (a) under the definition of Letter of Credit Default applies). A Pledging Party's failure to

provide either a substitute Letter of Credit or other Eligible Collateral in accordance with the foregoing shall constitute an MNA Default under Section 3(d)(viii) of the Master Agreement.

(iv)     Upon (A) the occurrence and continuation of an MNA Default with respect to the Pledging Party; (B) the occurrence and continuation of a UMA Default with respect to the Pledging Party; or (C) the designation of an early termination date under any Underlying Master Agreement by the Secured Party for which there exist any unsatisfied payment Obligations owed by the Pledging Party, then the Secured Party may draw on the entire, undrawn portion of any outstanding Letter of Credit.  Unless and until such amounts are applied to the Obligations of the Pledging Party, the cash proceeds received from drawing upon the Letter of Credit shall be deemed Performance Assurance as security for the Pledging Party's obligations to the Secured Party and the Secured Party shall have the rights and remedies set forth in Paragraph 7 with respect to such cash proceeds.  Notwithstanding the Secured Party's receipt of cash proceeds from a drawing under the Letter of Credit, the Pledging Party shall remain liable (y) for any failure to Transfer sufficient Performance Assurance or (z) for any amounts owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(v)     In all cases, the costs and expenses (including but not limited to the reasonable costs, expenses and attorneys' fees of the Secured Party) of establishing, renewing, substituting, canceling, and increasing the amount of a Letter of Credit shall be borne by the Pledging Party.

(c)     Care of Performance Assurance.  Except (x) as otherwise provided in Paragraph 6(a)(iii) and (y) for the exercise of reasonable care in the custody thereof, the Secured Party shall have no duty as to any Performance Assurance in its possession or control or in the possession or control of any Custodian or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Performance Assurance in its possession, and/or in the possession of its Custodian, if such Performance Assurance is accorded treatment substantially equal to that which it accords its own property.  In addition, the Secured Party shall not be liable or responsible for any loss or damage to any of the Performance Assurance in the possession or control of any Custodian, or for any diminution in the value thereof, by reason of its selection of the Custodian or the act or omission of any Custodian selected by the Secured Party in good faith, except to the extent such loss or damage is the result of such Custodian's willful misconduct or gross negligence.  Except as otherwise provided in Paragraph 6(a)(ii), nothing in this Collateral Annex shall be construed as requiring the Secured Party to select a Custodian for the keeping of Performance Assurance for its benefit.

Paragraph 7.  Exercise of Rights Against Performance Assurance.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

(a)     In the event that (i) an MNA Default with respect to the Pledging Party has occurred and is continuing; (ii) a UMA Default with respect to the Pledging Party has occurred and is continuing, or (iii) an early termination date has occurred or been designated under any Underlying Master Agreement by the Secured Party for which there exist any unsatisfied payment Obligations owed by the Pledging Party, the Secured Party may, in its sole discretion, exercise any one or more of the rights and remedies provided or permitted under the Agreement, in this Collateral Annex or as otherwise available under applicable law, including, without limitation, any of the following rights and remedies:

(i)     all rights and remedies available to a secured party under the UCC and other applicable laws with respect to the Performance Assurance held by or for the benefit of the Secured Party or otherwise;

(ii)     the right to set off any Performance Assurance held by or for the benefit of the Secured Party against and in satisfaction of any amount due and payable by the Pledging Party in respect of any of its Obligations;

(iii)     the right to draw on any outstanding Letter of Credit of which it is the beneficiary; or

(iv)     the right to liquidate any Performance Assurance held by or for the benefit of the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required by applicable law (which notice is hereby waived by the Pledging Party to the full extent permitted by applicable law), free from any claim or right of any nature whatsoever of the Pledging Party, including any right of equity or redemption by the Pledging Party (with the Secured Party having the right to purchase any or all of the Performance Assurance to be sold) and to apply the proceeds from the liquidation of such Performance Assurance to and in satisfaction of any amount due and payable by the Pledging Party in respect of any of its Obligations in such order as the Secured Party may elect.

(b)     The Pledging Party hereby irrevocably constitutes and appoints the Secured Party and any officer or agent thereof, with full power of substitution, as the Pledging Party's true and lawful attorney-in-fact with full irrevocable power and authority to act in the name, place and stead of the Pledging Party or in the Secured Party's own name, from time to time in the Secured Party's discretion, for the purpose of taking any and all action and executing and delivering any and all documents or instruments which may be necessary or desirable to accomplish the purposes of Paragraph 7(a), Paragraph 7(b), or otherwise carry out the rights and remedies granted hereby to Secured Party.

(c)     The Secured Party shall be under no obligation to prioritize the order with respect to which it exercises any one or more rights and remedies available hereunder. The Pledging Party shall in all events remain liable to the Secured Party for any amount

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

payable by the Pledging Party in respect of any of its Obligations remaining unpaid after any such exercise of rights or remedies.

(d)     If at any time an MNA Default with respect to the Secured Party has occurred and is continuing, then:

(1) the Secured Party will be obligated immediately to Transfer all of Pledging Party's Performance Assurance (including any Letter(s) of Credit) and any accrued but unpaid Interest Amount, if any, to the Pledging Party;

(2) the Pledging Party may do any one or more of the following: (x) exercise any of the rights and remedies of a pledgor with respect to the Performance Assurance, including any such rights and remedies under law then in effect; (y) with respect to Performance Assurance other than Letters of Credit, to the extent that such Performance Assurance or the Interest Amount is not Transferred to the Pledging Party as required by Paragraph 7(e)(1) above, set off Obligations payable to the Secured Party against such Performance Assurance held by the Secured Party or to the extent its rights of setoff are not exercised, withhold payment of any remaining Obligations payable by the Pledging Party, up to value of any such remaining Performance Assurance held by the Secured Party, until such Performance Assurance is Transferred to the Pledging Party; and (z) exercise rights and remedies available to the Pledging Party under the terms of any Letter of Credit; and

(3)     the Secured Party shall be prohibited from drawing on any Letter of Credit that has been posted by the Pledging Party for its benefit.

Paragraph 8. Disputed Calculations.

(a)     If the Pledging Party disputes the amount of Performance Assurance requested by the Secured Party and such dispute relates to the amount of the Net Exposure as determined by the Secured Party, then the Pledging Party shall (i) notify the Secured Party of the existence and nature of the dispute not later than the Notification Time on the first Local Business Day following the date that the demand for Performance Assurance is made by the Secured Party pursuant to Paragraph 4, and (ii) provide Performance Assurance to or for the benefit of the Secured Party in an amount equal to the Pledging Party's own determinations, made in a commercially reasonable manner, of the Pledging Party's Collateral Requirement in accordance with Paragraph 3. In all such cases, the Parties thereafter shall promptly consult with each other in order to reconcile the two conflicting determinations. If the Parties have not been able to resolve their dispute on or before the second Business Day following the date that the demand is made by the Secured Party, then the Secured Party's Net Exposure shall be recalculated with each Party's requesting quotations from one (1) Reference Market-Maker within two (2) Business Days (taking the arithmetic average of those quotations obtained to obtain the average Current Mark-to-Market Value, provided, that, if only one (1) quotation can be obtained, then that quotation shall be used) for the purpose of recalculating the Current

Mark-to-Market Value of each Transaction in respect of which the Parties disagree as to the Current Mark-to-Market Value thereof, and the Secured Party shall inform the Pledging Party of the results of such recalculation in reasonable detail. Performance Assurance shall thereupon be provided, returned, or reduced, if necessary, on the next Local Business Day in accordance with the results of such recalculation.

(b)    If the Secured Party disputes the amount of Performance Assurance to be reduced by the Secured Party and such dispute relates to the amount of the Net Exposure claimed by the Secured Party, then the Secured Party shall (i) notify the Pledging Party of the existence and nature of the dispute not later than the Notification Time on the first Local Business Day following the date that the demand to reduce Performance Assurance is made by the Pledging Party pursuant to Paragraph 5(a), and (ii) effect the reduction of Performance Assurance to or for the benefit of the Pledging Party in an amount equal to the Secured Party's own estimate, made in a commercially reasonable manner, of the Pledging Party's Collateral Requirement in accordance with Paragraph 5(a). In all such cases, the Parties thereafter shall promptly consult with each other in order to reconcile the two conflicting amounts. If the Parties have not been able to resolve their dispute on or before the second Business Day following the date that the demand is made by the Pledging Party, then the Secured Party's Net Exposure shall be recalculated by each Party requesting quotations from one (1) Reference Market-Maker within two (2) Business Days (taking the arithmetic average of those quotations obtained to obtain the average Current Mark-to-Market Value; provided, that, if only one (1) quotation can be obtained, then that quotation shall be used) for the purpose of recalculating the Current Mark-to-Market Value of each Transaction in respect of which the Parties disagree as to the Current Mark-to-Market Value thereof, and the Secured Party shall inform the Pledging Party of the results of such recalculation in reasonable detail. Performance Assurance shall thereupon be provided, returned, or reduced, if necessary, on the next Local Business Day in accordance with the results of such recalculation.

Paragraph 9.    Covenants; Representations and Warranties; Miscellaneous.

(a)    The Pledging Party shall execute and deliver to the Secured Party (and to the extent permitted by applicable law, the Pledging Party hereby authorizes the Secured Party to execute, deliver and/or file, in the name of the Pledging Party or otherwise) such financing statements, assignments and other documents and shall do such other things relating to the Performance Assurance and the security interest granted under this Collateral Annex, including any action the Secured Party may deem necessary or appropriate to perfect or maintain perfection of its security interest in the Performance Assurance, and the Pledging Party shall pay all costs relating to its Transfer of Performance Assurance and the maintenance and perfection of the security interest therein.

(b)    On each day on which Performance Assurance is held by the Secured Party and/or its Custodian under the Agreement and this Collateral Annex, the Pledging Party hereby represents and warrants that:

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

(i)      the Pledging Party has good title to and is the sole owner of such Performance Assurance (excluding Letters of Credit) free and clear of, and the execution, delivery and performance of the covenants and agreements of this Collateral Annex do not result in the creation or imposition of, any lien or security interest upon any of its assets or properties, including, without limitation, the Performance Assurance, other than the security interests and liens created under the Agreement and this Collateral Annex;

(ii)      upon the Transfer of Performance Assurance (excluding Letters of Credit) by the Pledging Party to, and assuming the continuous possession thereof by, the Secured Party and/or its Custodian, the Secured Party shall have a valid and perfected first priority continuing security interest therein, free of any liens, claims or encumbrances, except those liens, security interests, claims or encumbrances arising by operation of law that are given priority over a perfected security interest; and

(iii)      the Pledging Party is not and will not become a party to or otherwise be bound by any agreement, other than the Agreement, the Underlying Master Agreements and this Collateral Annex, which restricts in any manner the rights of (A) any present or future holder of any of the Performance Assurance with respect hereto, or (B) the Pledging Party to grant and create the security interest created hereby.

(c)      This Collateral Annex has been and is made solely for the benefit of the Parties and their permitted successors and assigns, and no other Person shall acquire or have any right under or by virtue of this Collateral Annex.

(d)      The Pledging Party shall pay on request and indemnify the Secured Party against any taxes (including without limitation, any applicable transfer taxes and stamp, registration, or other documentary taxes), assessments, or charges that may become payable by reason of the security interest, general first lien, and right of offset granted under this Agreement or the execution, delivery, performance, or enforcement of the Agreement, as well as any penalties with respect thereto (including, without limitation, costs and reasonable fees and disbursements of counsel).

(e)      No failure or delay by either Party hereto in exercising any right, power, privilege, or remedy hereunder shall operate as a waiver thereof.

(f)      The headings in this Collateral Annex are for convenience of reference only, and shall not affect the meaning or construction of any provision thereof.

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

## Exhibit A

### TO COLLATERAL ANNEX
### TO MASTER NETTING, SETOFF, SECUIRTY, AND COLLATERAL AGREEMENT

### IRREVOCABLE STANDBY LETTER OF CREDIT FORMAT

DATE OF ISSUANCE: _____

[Address]

Re:  Credit No. _____

We hereby establish our Irrevocable Transferable Standby Letter of Credit in your favor for the account of _____ (the "Account Party"), for the aggregate amount not exceeding _____ United States Dollars ($_____), available to you at sight upon demand at our counters at [Location] on or before the expiration hereof against presentation to us of one or more of the following statements, dated and signed by a representative of the beneficiary:

1."AN MNA Default (as defined in the Master Netting, Setoff, Security, and Collateral Agreement dated as of _____ between the Account Party and _____ as the same may be amended (the "Master Agreement")) has occurred and is continuing with respect to the Account Party under the Master Agreement and no MNA Default (as defined in the Master Agreement) or UMA Default (as defined in the Master Agreement) has occurred and is continuing with respect to the beneficiary of this Letter of Credit under the Master Agreement or [specify Underlying Master Agreement], respectively.  Wherefore, the undersigned does hereby demand payment of [$____] [the entire undrawn amount of the Letter of Credit]";

2."An early termination date has been designated with respect to the Account Party under an Underlying Master Agreement (as defined in the Master Netting, Setoff, Security, and Collateral Agreement dated as of _____ between the Account Party and _____ as the same may be amended (the "Master Agreement")) and no MNA Default (as defined in the Master Agreement) or UMA Default (as defined in the Master Agreement) has occurred and is continuing with respect to the beneficiary of this Letter of Credit under the Master Agreement or [specify Underlying Master Agreement], respectively.  Wherefore, the undersigned does hereby demand payment of [$____] [the entire undrawn amount of the Letter of Credit]".

3."A UMA Default (as defined in the Master Netting, Setoff, Security, and Collateral Agreement dated as of _____ between the Account Party and _____ as the same may be amended (the "Master Agreement")) has occurred and is continuing with respect to the Account Party under [specify Underlying

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

Master Agreement] and no MNA Default (as defined in the Master Agreement) or UMA Default (as defined in the Master Agreement) has occurred and is continuing with respect to the beneficiary of this Letter of Credit under the Master Agreement or [specify Underlying Master Agreement], respectively. Wherefore, the undersigned does hereby demand payment of [$_____] [the entire undrawn amount of the Letter of Credit.]"

This Letter of Credit shall expire on the earlier of (a) _____ or (b) the date of the beneficiary's and the Issuing Bank's receipt of a certificate containing one or more of the following statements, dated and signed by a representative of the Account Party:

1."AN MNA Default (as defined in the Master Netting, Setoff, Security, and Collateral Agreement dated as of _____ between the Account Party and _____ as the same may be amended (the "Master Agreement")) has occurred and is continuing with respect to the beneficiary of this Letter of Credit under the Master Agreement and no MNA Default (as defined in the Master Agreement) or UMA Default (as defined in the Master Agreement) has occurred and is continuing with respect to the Account Party under the Master Agreement or [specify Underlying Master Agreement], respectively. Wherefore, the undersigned does hereby request that this Letter of Credit be terminated";

2."An early termination date has been designated with respect to the beneficiary of this Letter of Credit under an Underlying Master Agreement (as defined in the Master Netting, Setoff, Security, and Collateral Agreement dated as of _____ between the beneficiary and _____ as the same may be amended (the "Master Agreement")) and no MNA Default (as defined in the Master Agreement) or UMA Default (as defined in the Master Agreement) has occurred and is continuing with respect to the Account Party under the Master Agreement or [specify Underlying Master Agreement], respectively. Wherefore, the undersigned does hereby request that this Letter of Credit be terminated".

3."A UMA Default (as defined in the Master Netting, Setoff, Security, and Collateral Agreement dated as of _____ between the Account Party and _____ as the same may be amended (the "Master Agreement")) has occurred and is continuing with respect to the beneficiary of this Letter of Credit under the Master Agreement and no MNA Default (as defined in the Master Agreement) or UMA Default (as defined in the Master Agreement) has occurred and is continuing with respect to the Account Party under the Master Agreement or [specify Underlying Master Agreement], respectively. Wherefore, the undersigned does hereby request that this Letter of Credit be terminated";

The amount which may be drawn by you under this Letter of Credit shall be automatically reduced by the amount of any drawings paid through the Issuing Bank referencing this Letter of Credit No. ____. Partial drawings are permitted hereunder.

We hereby agree with you that documents drawn under and in compliance with the terms of this Letter of Credit shall be duly honored upon presentation as specified.

This Letter of Credit shall be governed by the Uniform Customs and Practice for Documentary Credits, 1993 Revision, International Chamber of Commerce Publication

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute

No. 500 (the "UCP"), except to the extent that the terms hereof are inconsistent with the provisions of the UCP, including but not limited to Articles 13(b) and 17 of the UCP, in which case the terms of this Letter of Credit shall govern.

With respect to Article 13(b) of the UCP, the Issuing Bank shall have a reasonable amount of time, not to exceed three (3) banking days following the date of its receipt of documents from the beneficiary, to examine the documents and determine whether to take up or refuse the documents and to inform the beneficiary accordingly.

In the event of an Act of God, riot, civil commotion, insurrection, war or any other cause beyond our control that interrupts our business (collectively, an "Interruption Event") and causes the place for presentation of this Letter of Credit to be closed for business on the last day for presentation, the expiry date of this Letter of Credit will be automatically extended without amendment to a date thirty (30) calendar days after the place for presentation reopens for business.

This Letter of Credit is transferable, and we hereby consent to such transfer, but otherwise may not be amended, changed or modified without the express written consent of the beneficiary, the Issuing Bank and the Account Party.

[BANK SIGNATURE]

Version 1.1
October 25, 2002
© Copyright 2002 by the Edison Electric Institute